UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

PAT BEESLEY et al.,               )
                       Plaintiffs,    )
v.                                )
                                   )     No: 3:06-cv-00703-DRH-CJP
INTERNATIONAL PAPER COMPANY et al., )
                       Defendants.   )

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

Plaintiffs move that the Court enter partial summary judgment as to Defendants' liability for failure to collect securities lending revenue earned on securities owned by Plaintiffs' 401(k) retirement plans and securities lending revenue that could have been collected on the grounds that there is no genuine dispute as to the material facts underlying this part of Plaintiffs' claims and Defendants are liable under those facts as a matter of law for breach of fiduciary duties imposed by ERISA. Fed.R.Civ.P. 56; 29 U.S.C. §1132(a)(2); 29 U.S.C. §1109; 29 U.S.C. §§1103(c)(1), 1104(a)(1)(A), 1105(a), 1106. Plaintiffs submit the following memorandum in support of this motion.

<u>SUMMARY</u>

This is an action by participants in defined contribution retirement plans under ERISA against the fiduciaries of those plans for breach of fiduciary duties. While there are profound breaches of fiduciary duty which Defendants committed herein, this motion relates only to the narrow issue of Defendants' failure to collect for the plans income from securities lending, about which there is no genuine issue of material fact. Plaintiffs allege, *inter alia*, that Defendants breached their fiduciary duties under ERISA by failing to recover for the benefit of their plan securities lending revenue that was earned and that could have been earned on plan investments. Plaintiffs are entitled to summary judgment on that part of their broader claims for Defendants'

breach of their fiduciary duties because there is no genuine dispute as to the following material facts: the assets of the plans were invested in a commingled group trust, which included both International Paper's defined benefit pension plan and its defined contribution 401(k) plans; the 401(k) plans had an undivided interest in the assets of the group trust; the group trust earned revenues on the lending of securities held in the trust; the group trust did not allocate to the 401(k) plans their pro-rata share of the securities lending revenues. Defendants allocated all the securities lending revenues to a different plan in the group trust: *International Paper's own defined benefit plan*, from which International Paper reaped *all* of the benefit for its corporate account. That improper allocation of profits to only one owner of a commingled account expressly violates basic trust law and fiduciary duties under ERISA. Because there is no dispute about Defendants' liability on this issue, the Court must enter judgment in favor of Plaintiffs and leave for trial only the issue of the damages suffered by the 401(k) Plans as a result of this clear breach of fiduciary duty and prohibited transaction.

## I.   LEGAL STANDARDS

A.   Summary Judgment Standards.

The Court may enter summary judgment as to a portion of the claims at issue in this action, as to specific material facts of which there is no genuine dispute, and as to liability alone even if there is a genuine dispute on the amount of damages. Fed.R.Civ.P. 56(a), 56(d). The judgment sought should be rendered if there is no genuine issue as to any material fact and Plaintiffs are entitled to judgment as a matter of law. Rule 56(c); Breneisen v. Motorola Inc., 512 F.3d 972, 977 (7th Cir. 2008).

B.   Fiduciary Standards Under ERISA.

All assets of an employee benefit plan must be held in trust. 29 U.S.C. §1103(a). The assets of a plan "shall never inure to the benefit of any employ

er and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §1103(c)(1).

A fiduciary to a plan must discharge its duties with respect to the plan "solely in the interest of the participants and beneficiaries" of the plan and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A). A fiduciary to a plan also must discharge its duties with respect to the plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). These fiduciary duties "are those of trustees of an express trust-the highest known to the law." Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied* 459 U.S. 1069 (1982).

ERISA specifies certain transactions between fiduciaries, the plan, and parties in interest, that are *per se* breaches of the general duties of §1104(a)(1) and create liability regardless of the damage caused to the plan. 29 U.S.C. §1106; Keach v. U.S. Trust Co., 419 F.3d 626, 635 (7th Cir. 2005). Among these prohibited transactions are that a plan fiduciary cannot receive "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of a plan." 29 U.S.C. §1106(b)(3). A plan fiduciary also is prohibited from dealing "with the assets of the plan in his own interest or for his own account." 29 U.S.C. §1106(b)(1). A fiduciary cannot cause its plan to engage in a transaction that the fiduciary knew or should have known constituted a direct or indirect exchange or leasing of property between the plan and a party in interest, a direct or indirect furnishing of services

between the plan and a party in interest, or a direct or indirect transfer of any assets of the plan to, or use by or for the benefit of a party in interest. 29 U.S.C. §1106(a)(1)(A), (C), and (D).

A fiduciary to a plan is any individual named as a fiduciary in the plan document or identified as a fiduciary by an employer under a procedure specified in the plan. 29 U.S.C. §1102(a). A fiduciary to a plan also includes any individual who exercises discretionary authority or control over management of the plan, who exercises any authority or control over plan assets, and who has any discretionary authority or responsibility in the administration of the plan. 29 U.S.C. §1002(21)(A).

A fiduciary who breaches its duties under ERISA is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary." 29 U.S.C. §1109(a). Such a fiduciary is liable also for such equitable or remedial relief as the court may deem appropriate. Id. In a plan with multiple fiduciaries, each fiduciary is liable for the breach of the other fiduciaries in which the fiduciary knowingly participated, enabled by his own breach of duty, or knew of and failed to take reasonable measures to remedy. 29 U.S.C. §1105(a). Section 1105 imposes joint and several liability on co-fiduciaries. Donovan v. Robbins, 752 F.2d 1170, 1185-86 (7th Cir. 1985). Liability under §1105 is "extraordinarily broad." Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98, 106 (2d Cir. 1998), *cert. den.* 525 U.S. 876 (1998).

A participant in the plan is authorized to bring an action to recover such relief for the plan. 29 U.S.C. §1132(a)(2).

## II.  THE UNDISPUTED FACTS PROVE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

A.  Factual Background.

Plaintiffs are representatives of a class comprising the participants and beneficiaries of the International Paper's Hourly Savings Plan and Salaried Savings Plan. Doc. 240; Doc. 169 ¶47. The Hourly Savings Plan and the Salaried Savings Plan (collectively, the DC Plans) are individual account, defined contribution plans under ERISA and §401(k) of the Internal Revenue Code. 29 U.S.C. §1002(34); 26 U.S.C. §401(k); Exh. 1 at 4 (Preamble);[1] Exh. 2 at 4 (Preamble).[2] The assets of the DC Plans are held in a trust governed by the Amended And Restated Defined Contribution Plans Master Trust Agreement between International Paper Company and State Street Bank and Trust Company, dated September 26, 2003 (Master Trust).[3] Exh. 1 at 53; Exh. 2 at 53. The Master Trust was originally established in July 1992. Exh. 3 at 4. The Master Trust authorized the Trustee to "lend securities through a securities lending program of the Trustee, pursuant to a separate written securities lending agreement." Exh. 3 at 23 (§4.1(t)). Each of International Paper's retirement plans, including its traditional defined benefit pension plan (the DB Plan) were administered through separate master trusts.[4]

---

[1] Int'l Paper Co. Salaried Savings Plan (SSP). Page references are to the pdf page. All documents marked "IP-ERISA" were produced by Defendants in response to discovery requests. Sprinkle v. Lowe's Home Ctrs. Inc., No. 04-cv-4116-JPG, Doc. 45 at 3, 2006 WL 2038580 at *2 (S.D.Ill. July 19, 2006), citing United States v. Laurence, 934 F.2d 868, 871-72 (7th Cir. 1991).

[2] Int'l Paper Co. Hourly Savings Plan (HSP). Page references are to the pdf page.

[3] Exhibit 3. Page references are to the pdf page.

[4] In a defined benefit plan, the standard form of retirement benefit when ERISA was enacted, the employer provides the retiree a fixed amount of benefit and is personally liable for the insufficiency of plan investments to provide the benefits. In a defined contribution plan, the retiree receives only the amounts contributed to the plan by himself and his employer and the gains on the investments of those contributions. Defined contribution plans dominate ERISA plans today. See *e.g.*, Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439-40 (1999); LaRue v. DeWolff Boberg & Assoc. Inc., 128 S.Ct. 1020, 1025 (2008); Pension & Welfare Ben. Admin.

State Street Bank and Trust Company (State Street) is the trustee of the DC Plan Master Trust. Exh. 3 at 4. State Street is a fiduciary to the DC Plans as to the management of Plan assets in the Trust, except to the extent its actions are directed by the Plan Financial Officer. Exh. 1 at 53 §16.02; Exh. 2 at 53; §16.02; 29 U.S.C. §§ 1102(a)(2), 1103(a). State Street is obligated to follow the investment instructions provided to it by the Plan Financial Officer for the DC Plans. Exh. 1 at 53 §16.02; Exh. 2 at 53; Exh. 3 at 11-19 §3. At all times relevant, Defendant Robert Hunkeler has been the Plan Financial Officer for all of International Paper's retirement plans, including the DC Plans and the DB Plan. Exh. 5 at 2 (6:19-21), 3 (57:4-20, 58:2-8, 58:11-17, 171:9-11, 172:4-20), 4 (234:14-17).

International Paper was solely responsible for carrying out the funding policy and method for the DC Plans and controlling and managing operation and administration of the Plans. Exh. 1 at 46-48 §14.01; Exh. 2 at 46-48 §14.01. International Paper's directors were named fiduciaries of the DC Plans. Id.; 29 U.S.C. §1102(a). The directors appointed the Plan Financial Officer, who had discretion, power, and authority to determine and carry out the investment policies for the Plans, to appoint trustees to hold Plan assets, to invest Plan assets in investment vehicles, and to direct the trustees' investment and disposition of Plan assets. Exh. 1 at 46-48 §14.01; Exh. 2 at 46-48 §14.01. International Paper's directors also appointed the Plan Administrator for the DC Plans, another fiduciary. Exh. 1 at 47-48 §14.01(b); Exh. 2 at 47-48 §14.01(b); 29 U.S.C. §1102(a). Defendant Jerome Carter was the Plan Administrator from 2000 through 2004. Exh. 14 at 2 (23:3-11). Defendant Robert Florio was his successor. Exh. 15 at 2 (73:2-10).

Defendant International Paper Fiduciary Review Committee was a fiduciary charged with oversight of the DC Plans, whose members were appointed by International Paper's board of

---

(PWBA), "Study Of 401(k) Plan Fees And Expenses" (April 13, 1998), http://www.dol.gov/ebsa/pdf/401krept.pdf, filed as Exhibit 4 at 4-6.

directors. Exh. 14 at 2-3 (186:4 – 187:2). The Fiduciary Review Committee was replaced by Defendant International Paper 401(k) Committee in May 2004. Exh. 16 at 2 (60:9-19; 62:4-25). Defendants Alicen Francis, David Whitehouse, Patricia Neuhoff, and Ethel Scully were members of the 401(k) Committee. Exh. 17 at 2 (236:10-24), 4. The 401(k) Committee was a named fiduciary, charged with overseeing the operation of the DC Plans. Exh. 18 at 2 (27:4-18, 28:1-17). The 401(k) Committee shared responsibility to ensure that the assets of the Plans were properly managed, and held oversight responsibility for the actions of all fiduciaries to the DC Plans. Id.[5]

      B.      The Commingled Accounts Of The Group Trust And The DC Plan's Proportionate Interest In Each Security In Those Accounts.

On February 1, 2000, International Paper entered into an agreement with State Street to create the International Paper Company Commingled Investment Group Trust (Group Trust). Agreement Of Trust.[6] The Group Trust was created to allow International Paper's various retirement plans to commingle their assets into a pooled account for more efficient investment management. Exh. 6 at 4-5. Each plan's interest in the Group Trust accounts constituted "*an undivided interest in each of the underlying assets of the entity*." Id. at 8-9 §2.2 (emphasis added) 29 C.F.R. §2510.3-101(a)(2), §2510.3-101(h).[7] The Group Trust document also specified that all assets in the Group Trust were commingled and no one plan had any ownership interest in any

---

[5] For ease of reference, all defendants are collectively referred to as "Defendants".

[6] Exhibit 6. Page references are to pdf page.

[7] Commingled account trusts of National Banks are regulated by the Office of Comptroller of the Currency (OCC). 12 C.F.R. §9.18(a)("collective investment funds"). OCC regulations similarly require that each "participating account in a collective investment fund must have a proportionate interest in all the fund's assets." 12 C.F.R. §9.18(b)(3).

7

specific asset in the Group Trust: "No Participating Trust[8] or person having an interest in a Participating Trust shall own any particular asset of the Group Trust." Exh. 6 at 9 §2.4.

The investment funds in the Group Trust were invested and administered as units. Id. at 26 §5.2.

> Subject to the provisions of Article VI, for the purpose of maintaining the beneficial interests of the participating Trusts in the Group Trust Fund, the Group Trust Fund shall be divided into units of participation ("Units"), and the beneficial interest of each participating Trust in the Group Trust Fund shall be expressed by the number of Units and fractions of Unit allocated to it as hereinafter set forth. The Trustee shall maintain an account to which shall be credited the number of Units allocated to each participating Trust. *Each Unit in the Group Trust Fund shall have proportionate interest in the Group Trust Fund and none shall have priority or preference over any other*.

Id. (emphasis added). All earnings and gains from assets in a Group Trust account were to be credited to and reinvested in that Group Trust account. Id. at 12-13 §3.1(B). Such earnings and gains thus belonged to the participating plans whose assets were in that account, to be allocated to each participating plan according to their proportionate interests. This was confirmed by State Street in its letter to Mr Hunkeler, describing the commingled trust arrangement. Exh. 7. State Street indicated it "would allocate to each plan its pro-rata share of investment performance." Id. at 2.

From these documents and regulations it is clear that the DC Plans owned a proportionate interest in every security in the Group Trust account in which they participated. As to any Group Trust account in which the DC Plans and the DB Plan were participating trusts, no security in that account belonged to either the DC Plans or the DB Plan, and all earnings and gains from those securities should have been allocated to the DC Plans or the DB Plan according to their proportionate interests in the account.

---

[8] A participating trust was any of International Paper's retirement plan trusts that invested plan assets in the Group Trust commingled accounts. Exh. 6 at 8.

C.  The Securities Lending Program.

In or around 2000-2001, in order to enhance returns on assets, Mr Hunkeler as Plan Financial Officer and State Street as trustee commenced a securities lending program with various accounts in the Group Trust. Exh. 8 at 3 (57:11 - 58:4, 58:24 - 59:6); Exh. 11-A at 6-7 (55:2 - 56:7), 9 (depo. exh. 10).[9] The program was described in a Securities Lending Authorization Agreement (SLAA) with State Street executed on December 8, 2000. Exh. 9.[10] Under the securities lending program, State Street loaned securities it held as trustee to a borrower in return for cash collateral equal to 102% of the value of the loaned securities. Exh. 9 at 8-9 §8(a). State Street invested the cash in income-producing investments, paid a portion of the income back to the borrower (the "rebate"), and then paid 65% of the net to the trust, keeping the remaining 35%. State Street guaranteed the borrower's return of the securities. Id. at 12-13 §14. The securities lending program extended to all securities State Street held as trustee ("Available Securities"), "except those securities that the Client or the Investment Manager specifically identifies in notices to State Street as not being Available Securities." Id. at 5, §3. Mr Hunkeler and International Paper stated that they used an extensive process to ensure the securities lending program was prudent. Exh. 8 at 4 (66:8-24).

From 2001-2007, International Paper gained and kept for its corporate account over $16 million from the securities lending program. Exh. 10.[11] The securities lending program generated this revenue by using securities in the Group Trust accounts. Exh. 8 at 3 (58:24 - 59:6); Exh. 11-

---

[9] Mr Hutson was produced as International Paper's designee under Rule 30(b)(6) to provide information regarding the commingled accounts. See Doc. 245.

[10] Page references are to the pdf page. A representative of State Street signed the document on behalf of each party to the Agreement. Exh. 9 at 16.

[11] Accumulation of amounts indicated in "Monthly Earnings" column of exh. 10. See Exh. 11-A at 2-3 (12:13-23,14:13-20). See also id. at 4 (19:9 - 21:2), 5-6 (37:5-10, 41:9 - 42:3, 42:4-18, 44:4--21); Exhs. 11-B, 11-C (depo exhs. 3-9).

A at 3 (16:4 - 17:25), 10-15 (depo exh. 2); Exhs. 11-B, 11-C (depo exhs. 3-9). The DC Plans were part owners of those accounts. Exh. 11-A at 3 (16:4 - 17:3), 4 (21:19-25, 22:8-12), 10-15 (depo exh. 2). The DB Plan also was part owner of the accounts. Id. at 3 (17:4-9), 4-5 (22:22 - 23:13).

Yet, although the DC Plans were part owners of the Group Trust accounts that generated the securities lending revenue and the DC Plans' assets were indivisible commingled assets with the DB Plan, International Paper allocated *all* of the $16 million profit to its DB Plan. Exh. 8 at 3 (60:3-8); Exh. 11-A at 6 (54:14 - 55:11), 9 (depo. exh. 10). International Paper did not formally include the DC Plans in the Securities Lending Authorization Agreement until December 31, 2007. Exh. 12.[12] *Thus, International Paper used 401(k) Plan assets to generate income from securities lending, yet kept all of the income itself*. What makes the allocation of all securities lending revenue to the DB Plan and International Paper particularly outrageous is the fact that International Paper charged securities lending program expenses to the DC Plans, even though the DC Plans allegedly were not part of the securities lending program. Exh. 19 at 2-3 (163:21 - 165:5), 4-6 (depo. exh. 137).[13]

    D.    <u>International Paper's Allocation Of All $16 Million Of Securities Lending Revenues To Its DB Plan Was In Breach Of Its Fiduciary Duties To The DC Plans</u>.

Both as a matter of law and under the terms of the Group Trust, the DB Plan did not own any of the securities in the Group Trust accounts; instead, the DB Plan owned only an undivided proportionate interest in the securities in the accounts - the same undivided interest the DC Plans

---

[12] First Amendment To The Securities Lending Authorization Agreement.

[13] In May 2005, International Paper allocated to the DC Plans $4,467 out of $11,908 (38%) in 2004 securities lending program charges invoiced by State Street. State Street delivered a number of such invoices to International Paper, which likely also were allocated to the DC Plans.

owned (albeit a different proportion). If International Paper, Hunkeler, and State Street wanted to engage in securities lending with only DB Plan assets (as the SLAA seems to suggest), they should have separated DB Plan assets into separate accounts owned solely by the DB Plan.

They did not do that. Instead, they used a portion of the commingled securities in the Group Trust accounts and claimed that portion "belonged" to the DB Plan. Exh. 8 at 3-4 (60:20 - 61:13, 62:8-16); Exh. 11-A at 9 (depo. exh. 10). The means by which they attempted that "apportionment" is indicated in a December 12, 2000 email, sent shortly before the securities lending program commenced. Exh. 11-A at 6-7 (55:25 - 56:7, 56:20 - 58:7), 9 (depo. exh. 10). In that email, State Street indicated that it

> will put a cap on the lending from the Pools where there are combined DB/DC assets of 90% of the position. In this way we can lend from portfolios done in daily pricing in Westwood, but we can credit all the income back to the pension trust in Quincy because we can say that we never lent the DC "portion" of each position.

Id. at 9.[14] State Street put "portion" in quotes because it is a false notion to suggest there were separate portions of the *indivisible* assets in the Group Trust pooled accounts. As the Plan Financial Officer for both Plans confirmed, neither Plan owned any separate portion of any of the securities loaned out by State Street; they were indivisible, pooled, commingled accounts. Exh. 8 at 4 (62:2-22).

As a matter of law, International Paper's treatment of the loaned securities as belonging entirely to the DB Plan was improper. The DB Plan did not own a separate "portion" of the commingled accounts. The securities loaned by State Street from Group Trust accounts were not solely DB Plan securities, but also DC Plan securities. Any losses that resulted from the securities lending program would have been allocated to the Group Trust accounts, not the DB

---

[14] "Pools" refers to the commingled - or pooled - accounts in the Group Trust. See, *e.g.*, exh. 11-A at 3 (18:6-16), 5 (23:5-13, 24:2-23, 37:14-23); Exh. 8 at 2 (12:13-19), 4 (62:2-22).

Plan, and thus would have diminished the DC Plans' proportionate interests. Since the DC Plan owned a pro-rata share of *all* securities in the Group Trust accounts, it necessarily owned a pro-rata share of the securities used in the securities lending program. Hence, the DC Plan is entitled to that pro-rata share of the revenues earned from the securities lending program. This follows both from the provisions of the Group Trust and DOL regulations that hold the DC Plan had an undivided pro-rata interest in *all* the securities in its Group Trust accounts, as well as the common law of trusts.[15]

When a trustee mingles trust property with his individual property in one indistinguishable mass, the trust beneficiary is entitled to a constructive trust on the mingled property in such proportion as the trust property bears to the whole mingled property. RESTATEMENT (SECOND) OF TRUSTS §202, cmt. h. Where the property is or becomes more valuable than the mingled mass with which it is acquired, the beneficiary is entitled to a proportionate share of the gain. Id. "Where a trustee wrongfully mingles property held by him as trustee under different trusts and exchanges the mingled mass for other property, the beneficiaries of the trusts are entitled to enforce a constructive trust on the property so acquired and are entitled to share the property proportionately." Id. cmt. n., illus. 26, 27. See also In re Goldstick, 177 A.D.3d 225, 236-38, 581 N.Y.S.2d 165, 171-72 (1992)(profits must be allocated in proportion to trust's share of investment); Marcus v. Otis, 169 F.2d 148, 150 (2d Cir. 1948).

---

[15] The common law of trusts provides fiduciary standards under ERISA to the extent not inconsistent with explicit statutory standards. Varity Corp. v. Howe, 516 U.S. 489, 496 (1996) Harris Trust & Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 250-51 (2000). As indicated in those cases, among others, the Supreme Court looks to common law sources such as the Restatements to define fiduciary duties under ERISA.

As a matter of law, a portion of the $16 million of securities lending revenue from 2001-2007 belongs to the DC Plans.[16] Mr. Hunkeler, and the other Defendants breached their fiduciary duties to the DC Plans by failing to collect the Plans' pro-rata share of that $16 million and instead giving it all to International Paper. They allowed DC Plan assets to inure to the benefit of International Paper and allowed DC Plan assets to be used for purposes other than providing benefits to the DC Plan participants and defraying reasonable expense of administration. 29 U.S.C. §1103(c)(1); 29 U.S.C. §1104(a)(1)(A). No prudent fiduciary would allow plan assets to be subject to a risk of loss by being used in a securities lending program without ensuring the plan received its proportionate share of the gains if the securities lending program succeeded. 29 U.S.C. §1104(a)(1)(B).

International Paper directly benefitted from the allocation of all $16 million in securities lending revenue to the DB Plan because, in a defined benefit plan, International Paper, as any company, is obligated to provide a specific amount in retirement benefits to plan participants. International Paper bore the risks that the investments in the DB Plan would provide insufficient returns to meet those pension obligations, whether from poor investment performance or high administrative expenses. *E.g.,* Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439-40 (U.S. 1999); Exh. 4 at 4-6. Thus, any additional revenues allocated to the DB Plan directly benefitted International Paper by reducing its pension obligations. International Paper directly benefitted from the allocation of all $16 million of securities lending revenue to the DB Plan.

---

[16] At one point, total assets in the DB Plans equaled $8.5 billion and total assets in the DC Plans were $4.3 billion. Exh. 8 at 4 (110:11-12). Arguably this provides at least a starting point for allocation of the profits from the securities lending program. Plaintiffs will present at trial what specific amount of the securities lending revenue should be allocated to the DC Plans. Defendants' liability for the illegal appropriation of all securities lending income to the DB Plan (and hence to International Paper) can be decided now.

13

E.    Defendants Engaged In Prohibited Transactions.

Because of this direct benefit from use of assets that were partially owned by the DC Plans, International Paper engaged in a prohibited transaction under 29 U.S.C. §1106(b)(3). That law prohibits a fiduciary to the DC Plans from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Id. International Paper received consideration for its own personal account in the form of reduction of its pension obligations through allocation of securities lending revenue properly belonging to the DC Plans to its DB Plan. International Paper received this consideration from a party dealing with the DC Plans because it received the securities lending revenue from State Street, the trustee and a fiduciary of the DC Plans. State Street provided the securities lending revenue to International Paper in connection with a transaction involving the assets of the DC Plans because the securities lending revenue came from securities in the Group Trust accounts of which the DC Plans were an owner, *i.e.*, from DC Plan assets.

State Street itself engaged in a prohibited transaction under 29 U.S.C. §1106(b)(1). That law prohibits a fiduciary from dealing "with the assets of the plan in his own interest or for his own account." Id.  State Street - trustee and fiduciary to the DC Plans and trustee of the Group Trust accounts - dealt with the DC Plans' trust assets for its own account by using the Group Trust securities for securities lending, from which it received 35% of the net revenues. As co-fiduciaries, Defendants are liable for that prohibited transaction because they knowingly participated in that arrangement and imprudently and disloyally put State Street into position to commit that breach of its duties for International Paper's benefit. 29 U.S.C. §§1105(a)(1), 1105(a)(2). They also knew State Street was lending Group Trust securities in which the DC Plans had interests but diverting all securities lending profits only to the DB Plan and undertook

14

no efforts to remedy that breach of State Street's fiduciary duties to the DC Plans. 29 U.S.C. §1105(a)(3).

International Paper, through its officers and employees, and Mr Hunkeler, as well as the other Defendants, engaged in prohibited transactions under parts (A), (C), and (D) of 29 U.S.C. §1106(a)(1). That law prohibits a fiduciary with respect to the DC Plans from causing the DC Plans to engage in a transaction that the fiduciary knew or should have known constituted a direct or indirect (A) exchange or leasing of property between the Plans and a party in interest, (C) furnishing of services between the Plans and a party in interest, or (D) transfer to, or use by or for the benefit of a party in interest of any assets of the Plans. 29 U.S.C. §1106(a)(1). All fiduciaries of the DC Plans are parties in interest. 29 U.S.C. §1002(14). International Paper and Mr Hunkeler caused the DC Plans to deliver its securities in the Group Trust accounts to State Street either as an exchange of Plan property (A), or furnishing of a service (C), if not a transfer or use of Plan assets (D) in the securities lending program.

The DOL provides exemptions from the proscription against prohibited transactions for certain securities lending programs. PTE 2006-16, 71 Fed. Reg. 63786 (Oct. 31, 2006); PTE 82-63, 47 Fed. Reg. 14804 (Apr. 6, 1981); PTE 81-6, 46 Fed. Reg. 14804 (Jan. 23, 1981);[17] 29 U.S.C. §1108(a). Defendants and State Street did not qualify for those exemptions because there is no written authorization for the securities lending program from a fiduciary of the DC Plans other than State Street. *E.g.*, PTE 2006-16 §IV(d)(1), 71 Fed.Reg. at 63797 (third column).[18] These limited exemptions, which International Paper did not satisfy, demonstrate that a securities

---

[17] PTE 2006-16 incorporates and expands the exemptions previously provided in PTE 82-63 and 81-6. 71 Fed.Reg. at 63786 (third column).

[18] Exh. 12 does not constitute such a written authorization because it is signed by State Street employees, the "Lending Fiduciary" in PTE 2006-16. Exh. 12 at 2.

15

lending program involving plan assets are prohibited by ERISA unless the conditions of the exemptions are met.

      F.      <u>Defendants Breached Their Duties Of Prudence In Failing To Formally Use DC Plan Assets For Securities Lending Before 2008</u>.

Attempting to limit the securities lending program to DB Plan assets was itself a breach of Defendants' duty of prudence and loyalty because it denied a safe source of additional revenue for the DC Plans. Defendants should have formally used DC Plan assets for the securities lending program and earned additional revenues for the DC Plans.

When International Paper formally included the DC Plans in the securities lending program, the benefits to both the DC Plans and the DB Plan were immediate. In addition to increasing the total amount of securities available for lending (and thus the revenues earned), the percentage of the securities lending revenue that was allocated to the Plans increased from 65% to 80%. Exh. 8 at 5 (140:9-25, 115:10 - 116:19), 6-7 (depo exh. 30). One of the International Paper employees in Mr Hunkeler's group, Carol Sung, noted in September 2006 that formally including the DC Plans in the securities lending program could provide additional revenue to the DC Plans of $450,000 per year. <u>Id.</u> at 5 (115:10 - 116:19), 6-7 (depo exh. 30).

There is no legitimate explanation why the DC Plans were not formally included in the securities lending program when it was started in 2001. As shown by the DOL's PTE 81-6 and PTE 82-63, securities lending was a known and accepted practice since the early 1980s.[19] The DC Plans would have received cash collateral of 102% of the value of the securities they loaned and State Street guaranteed the return of those securities. Mr Hunkeler and his group undertook

---

[19] Securities lending "is not a new concept. It is well-tested and involves little risk to lenders. . . . There is no logical reason for engaging in securities lending in the company's pension plan but not in its Savings Plan." Exh. 13 at 30-31 ¶¶ 76-77 (Expert Report of Paul Kampner) (based on personal experience at Chase Manhattan Bank in 1980s). Kampner has over 40 years of experience with employee retirement plans. <u>Id.</u> at 5-6 ¶¶1-9.

an extensive process to determine the securities lending program was prudent for the DB Plan. Exh. 8 at 4 (66:8-24). Indeed, since International Paper's own money was on the line if the securities lending program were imprudent, it is clear the process Mr Hunkeler undertook to ensure the safety of the program was thorough and sure. What was prudent for the DB Plan thus was prudent for the DC Plans. It was a breach of Defendants' duties of prudence and loyalty not to include the DC Plans formally in the securities lending program in 2001. 29 U.S.C. §1104(a)(1). The DC Plans were damaged from this breach of fiduciary duties by the lost revenues that could have been earned from being included in the securities lending program.

IV. CONCLUSION AND RELIEF REQUESTED

The facts regarding the securities lending program operated by Defendants and State Street are not in dispute. Under those facts, Defendants are liable for using DC Plan assets in the securities lending program, but allocating all revenues from the securities lending program only to International Paper's DB Plan, and hence to International Paper. In addition, Defendants are liable for failing to formally include the DC Plans in the securities lending program from its inception in 2001. Because the facts on these issues are undisputed and Defendants are liable under those facts as a matter of law, the Court must enter summary judgment as to Defendants' liability at this time. The calculation of the DC Plans' damages will be determined after trial along with the numerous other instances of breach of fiduciary duties at issue in this lawsuit.

January 23, 2009                                          Respectfully submitted:

/s/ Jerome J. Schlichter
Jerome J. Schlichter  02488116
jschlichter@uselaws.com
Nelson G. Wolff 6211943
nwolff@uselaws.com
Sean E. Soyars 57317 (MO)
ssoyars@uselaws.com
120 W. Main Street, Suite 208
Belleville, IL 62220

100 S. Fourth Street, Suite 900
St. Louis, MO
(314) 621-6115
(314) 621-7151 (Fax)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on January 23, 2009, I filed this document with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Gregory C. Braden | Michael J. Nester |
| Donald L. Havermann | Donovan, Rose, Nester & Joley, P.C. |
| Bridgit M. DePietto | 8 East Washington Street |
| Simon J. Torres | Belleville, IL 62220 |
| Shannon M. Callahan | Telephone (618) 235-2020 |
| Morgan Lewis & Bockius | |
| 1111 Pennsylvania Avenue, NW | |
| Washington, DC 20004 | |