UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

PAT BEESLEY et al.,                    )
                          Plaintiffs,  )
v.                                     )
                                       )    No: 3:06-cv-00703-DRH-CJP
INTERNATIONAL PAPER COMPANY et al.,    )
                                       )
                          Defendants.  )

**MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Court must deny Defendants' Partial Motion For Summary Judgment (Doc. 254),[1]

seeking summary judgment as to only a portion of Plaintiffs' claims, because the material facts

as to those claims are in dispute and Defendants are not entitled to judgment as a matter of law.

Fed.R.Civ.P. 56; SDIL-LR 7.1(d).

## I.    FACTUAL BACKGROUND

Plaintiffs are representatives of a class comprising the participants and beneficiaries of

the International Paper Company's Hourly Savings Plan and Salaried Savings Plan (collectively,

the Plans). Doc. 240; Doc. 169 ¶47. The Plans are individual account, defined contribution plans

under ERISA and §401(k) of the Internal Revenue Code. 29 U.S.C. §1002(34); 26 U.S.C.

§401(k); Doc. 253-2 at 4[2]; Doc. 253-3 at 4. International Paper (IP) is the sponsor of the Plans

and its employees are participants in the Plans. Doc. 253-2 at 4; Doc. 253-3 at 4; 29 U.S.C.

§1002(16)(B). IP also sponsored a Pension Plan, a defined benefit plan under 29 U.S.C.

§1002(35), under which IP was obligated to pay a specific amount of retirement benefits to the

participants thereof and in which the investments accrued to IP's benefit. See e.g., Hughes

---

[1] Defendants did not file a Motion. Defendants' Memorandum is referred to herein as MIS. Page cites are to the memorandum pages.

[2] Page references to ECF documents are to the pdf page.

1

Aircraft Co. v. Jacobson, 525 U.S. 432, 439-40 (1999); LaRue v. DeWolff Boberg & Assoc. Inc., 128 S.Ct. 1020, 1025 (2008); Doc. 253-5 ("Study Of 401(k) Plan Fees And Expenses"); Doc. 253 at 5 n.4 (Plaintiffs' Motion For Partial Summary Judgment).

IP was solely responsible for carrying out the funding for the Plans and controlling and managing operation and administration of the Plans. Doc. 253-2 at 46-48 §14.01; Doc. 253-3 at 46-48 §14.01. IP's directors were named fiduciaries of the Plans. Doc. 253-2 at 48-49 §14.03; Doc. 253-3 at 48-49 §14.03; 29 U.S.C. §1102(a). The directors appointed the Plan Financial Officer, who had discretion and authority over Plan investment policies, to appoint trustees to hold Plan assets, to invest Plan assets in investment vehicles, and to direct the trustees' investment and disposition of Plan assets. Doc. 253-2 at 46-48 §14.01; Doc. 253-3 at 46-48 §14.01. At all times relevant, Defendant Robert Hunkeler, IP's Vice President of Investments and head of IP's Trust Department, has been and remains the Plan Financial Officer. Doc. 253-6 at 2-4 (6:19-21, 57:4-20, 58:11-17, 171:9-11, 172:4-20, 234: 14-17); App. at 208.[3]

IP, through its directors, also appointed the Plan Administrator for the Plans, another fiduciary. Doc. 253-2 at 47-48 §14.01(b); Doc. 253-3 at 47-48 §14.01(b); 29 U.S.C. §1102(a). The Administrator is a senior officer of IP. App. at 207. Defendant Jerome Carter was the Plan Administrator from 2000 through 2004. Doc. 253-17 at 2 (23:3-11). Defendant Robert Florio was his successor. Doc. 253-18 at 2 (73:2-10).

Defendant International Paper Fiduciary Review Committee was a fiduciary charged with oversight of the Plans. Doc. 253-17 at 2-3 (186:4 - 187:2). IP, through its directors, appointed the Committee members. Id. The Fiduciary Review Committee was replaced by Defendant International Paper 401(k) Committee in May 2004. Doc. 253-19 at 2 (60:9-19; 62:4-

---

[3] "App." refers to the "Appendix" Defendants filed in support of their Motion. Docs. 255-2 - 255-35, 236-2. Page references are to the number Defendants put in the upper right portion of the document.

25). Defendants Alicen Francis, David Whitehouse, Patricia Neuhoff, and Ethel Scully were members of the 401(k) Committee. Doc. 253-20 at 2 (236:10-24), 4. The 401(k) Committee was a named fiduciary, charged with overseeing operation of the Plans. Doc. 253-21 at 2 (27:4-18, 28:1-17). The 401(k) Committee shared responsibility to ensure that the assets of the Plans were properly managed and held oversight responsibility for the actions of all fiduciaries to the Plans. Id.[4] IP acknowledged its status as a fiduciary. Exh. 22 at 1, 6.[5]

From these facts, it is evident IP is a fiduciary. Cf. MIS at 25-26 (Part VII). Contrary to Defendants' assertion, Plaintiffs do not claim IP is liable for its settlor-function acts. IP's responsibility for "carrying out the funding policy and method for the Plans, and for controlling and managing operation and administration of the Plan" was discretionary authority and control respecting management of the Plans and discretionary authority and responsibility in the administration of the Plans, both fiduciary functions. 29 U.S.C. §1002(21)(A). IP also had fiduciary duties in the selection of named Plan fiduciaries. See Ed Miniat Inc. v. Globe Life Ins. Group Inc., 805 F.2d 732, 736 (7th Cir. 1986); Leigh v. Engle, 727 F.2d 113, 135 (7th Cir. 1984). In addition, IP is liable for the acts of its officers, whom it appointed to engage in the breaches at issue in this lawsuit, since a corporation acts only through its officers. E.g., McMahon v. McDowell, 794 F.2d 100, 109 (3d Cir. 1986). IP also clearly claimed to participants that it was administering and monitoring the Plan for their protection, stating in at

---

[4] For ease of reference, all defendants are collectively referred to as "Defendants", unless otherwise indicated.

[5] Exhibit references are to the exhibits filed with this Memorandum, unless otherwise indicated. Page references are to the pdf page. All documents marked "IP-ERISA" were produced by Defendants in discovery and are presumed authentic because Defendants have not disputed authenticity and because the documents have distinctive authenticating characteristics. Fed.R.Evid. 901(b)(4); Snyder v. Whittaker Corp., 839 F.2d 1085, 1089 (5th Cir.1988); Maljack Prods. Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996); Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423-24 (10th Cir. 1991).

least one communication that it provided "a dedicated team of *experienced IP professionals* whose job it is to ensure that all of the Plan's Funds deliver the results you expect." App. 1464 (emphasis added).[6]

## II.    DEFENDANTS' FIDUCIARY DUTIES AND JOINT AND SEVERAL LIABILITY

As Plan fiduciaries, Defendants were obligated to discharge their duties "solely in the interest of the participants and beneficiaries" of the plan and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A). Defendants also were obligated to pay no more than reasonable compensation to providers of services to the Plans. 29 U.S.C. §1106(a)(1), §1108(b)(2); 29 U.S.C. §1103(c)(1). Defendants had to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). Defendants had a "duty to act with complete and undivided loyalty to the beneficiaries of the trust and with an eye single to the interests of the participants and beneficiaries." Leigh, 727 F.2d at 123. These fiduciary duties "are those of trustees of an express trust - *the highest known to the law*." Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir.) (emphasis added), *cert. denied* 459 U.S. 1069 (1982).

A fiduciary that breaches its duties under ERISA is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary." 29 U.S.C. §1109(a). The fiduciary is liable also for such equitable or remedial relief

---

[6] Defendants' claim that Plaintiffs did not identify IP as a fiduciary is belied by ¶¶ 33, 100, 173, and 189(A) of the First Amended Complaint (Doc. 169). Cf. MIS at 25.

as the court may deem appropriate. Id. In a plan with multiple fiduciaries, each fiduciary is liable

for breaches by the other fiduciaries in which the fiduciary knowingly participated, enabled by

its own breach of duty, or knew of and failed to take reasonable measures to remedy. 29 U.S.C.

§1105(a). Section 1105 imposes joint and several liability on co-fiduciaries. Donovan v.

Robbins, 752 F.2d 1170, 1185-86 (7th Cir. 1985). Liability under §1105 is "extraordinarily

broad." Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98, 106 (2d Cir. 1998), *cert. den.* 525

U.S. 876 (1998). Any participant in a plan is authorized to bring an action to recover such relief

for the plan. 29 U.S.C. §1132(a)(2), §1132(a)(3).

### III.     PLAINTIFFS' CLAIMS

Defendants breached their fiduciary duties to the participants in the Plans in numerous

respects, not all of which are at issue in Defendants' Motion. MIS at 1-2. As to the claims they

do address, Defendants misconstrue the claims in an attempt to distort them into legally invalid

forms. Properly stating all of Plaintiffs' claims thus disposes of most of Defendants' arguments.

The claims and the numerous facts and documents that prove Plaintiffs' case are detailed in

Plaintiffs' expert witness reports, examination of which will demonstrate Defendants are not

entitled to summary judgment. Exhs. 1, 3, 5-8. A dispute among expert witnesses, particularly as

to performance of fiduciary duties, raises a question of fact that cannot be resolved on summary

judgment. Abilene Retail No. 30 Inc. v. Bd. of Com'rs of Dickinson County, 492 F.3d 1164,

1188 (10th Cir. 2007); Black & Decker Corp. v. U. S., 436 F.3d 431, 442 (4th Cir. 2006); Roth

v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994).

1. Excessive Administrative Fees. Defendants caused the Plans to pay unreasonable fees

for the administration of the Plans (mostly recordkeeping services), which cost the Plans over

$58 million in excessive fees. Exh. 1 at 5 ¶7, 11-18, 26-65; 29 U.S.C. §1104(a)(1)(A)(ii),

§1106(a)(1), §1108(b)(2), §1103(c)(1). The Plan Financial Officer, Mr. Hunkeler, warned IP that

the fees in the Plans were excessive back in 1997. Exh. 10 at 8-9 (148:4 - 149:17), 18-27. He noted that the current recordkeeper charged $112 per participant, whereas a plan with over 500 participants should pay only $37.16 per participant.[7] Id. at 20. Hunkeler himself calculated that the Plans were paying excessive fees of at least $2.6 million *per year*. Id. at 20. As Hunkeler noted, "not only are we in the minority of companies charging recordkeeping and administrative expenses to their plans, but *we're probably also doing a poor job of controlling those expenses*." Id. at 21. He warned that failure to take action on the excessive fees could result in regulatory action and/or participant litigation. Id. at 19.

Defendants failed to take any action on Hunkeler's recommendations for five years - until 2002 - and even that action was inadequate. Exh. 10 at 7-11 (147:4 - 150:18, 160:1-8). Administrative fees were still excessive, and the awarding of the recordkeeping contract to JPMorgan was tainted by a profound conflict of interest (described below at 7). Exh. 1 at 11-12, ¶31(a).[8] Further, from 2000 through 2005 IP was informed by its consultant that the Plans' fees were excessive. Id. at 12 ¶32; e.g., exh. 11 at 7 (310:16-23), 18, 32.[9] Only in 2008, after this suit was filed, did Defendants reduce fees to close to the level Hunkeler recommended in 1997. Exh. 1 at 12-13 ¶31(b),¶36; exh. 10 at 14 (366:15-19). Defendants do not seek summary judgment on these excessive fees in their Motion, although they mischaracterize these claims, as discussed in Part VII below at 29.

---

[7] Hunkeler recognized that calculating administrative fees on a per participant basis was the prudent way of calculating the fees, as opposed to a percentage of asset value of the plan. The cost of administrative services does not increase with the amount of assets in a plan. Further, as the number of participants increases, the per participant cost decreases because of economies of scale. IP's 401(k) Plans had over 33,000 participants in 1997. Exh. 1 at 13 ¶35; Exh. 3 at 17-18 ¶54.; Exh. 23 at 2, 4.

[8] Exhibit 1 includes the opinions of Plaintiffs' expert Al Otto, an independent fiduciary with vast experience in 401(k) plan administration, who has been ranked one of the 100 most influential 401(k) experts in the country. Exh. 1 at 66-68; Exh. 2 at 2, 6.

[9] Plaintiffs do not concede the accuracy of this or any other survey from CEM, and point to it only to show what information was provided to Defendants.

6

2. <u>Excessive Investment Management Fees.</u> Defendants caused the Plans to pay unreasonable fees for the management of Plan investment options, which cost the Plans $52 million in excess fees. Exh. 3 at 16-18 (Part C).[10] One consultant expressly informed Defendants in 1999 that the Plans' investment management fees were too expensive. <u>Id.</u> at 16-17 ¶48. Contrary to Defendants' contention, Plaintiffs' claims for excessive fees are not based on a failure to adequately disclose revenue sharing to participants, but instead using Plan assets to pay expenses of administration that were not reasonable.[11] 29 U.S.C. §1104(a)(1)(A)(ii), §1106(a)(1), §1108(b)(2), §1103(c)(1); cf. MIS at 22-23 (Part V); see Part VII below at 29. Other than that, Defendants do not address excessive investment management fees in their Motion.

3. <u>Conflicts of Interest with JPMorgan.</u> The excessive fees did not just occur because IP fiduciaries ignored their fiduciary duties. They were deliberately incurred to benefit *IP* by steering money to JPMorgan, with whom IP had corporate business. Defendants do not address this issue in their Motion, yet it helps explain the motivation for the many breaches of fiduciary duties in this Plan.

JPMorgan had been managing IP's Pension Plan since 1981 and was the primary underwriter for IP stock offerings. Exh. 12 at 5-6 (19:16 - 20:2); exh. 5 at 4 ¶2. IP had extensive business with JPMorgan. Exh. 12 at 7-9 (28:5 - 30:2). IP's relationship with JPMorgan was "important" and a "strong partnership" that IP wanted to extend to the 401(k) Plans. Exh. 13 at 13-15 (80:7-11, 81:20 - 82:6), 32. Despite its duty to operate the Plans for participants' exclusive benefit, IP saw creating a new plan structure and bidding process as a way of presenting "*a lot of opportunities for JPM*." <u>Id.</u> at 18 (emphasis added).

---

[10] Exhibit 3 includes the opinions of Plaintiffs' expert Steven Pomerantz, a Ph.D. in Mathematics (U.C. - Berkeley '86) with over 20 years of experience in investment management. Exh. 3 at 20-22.

[11] In fact, Plaintiffs' experts do not address revenue sharing at all except for a brief period during 1999-2001. Exh.1 at 29-39.

IP issued a request for proposals for administration of the Plans in 2000. The initial evaluation of the bids indicated a bidder other than JPMorgan offered the Plans the best "overall value." IP's response was not to award the contract to the lower bidder, but instead to explain to JPMorgan why it scored lower, and, in a remarkable display of its desire to steer the business to JPMorgan, advise JPMorgan on how to adjust its proposal to win the contract. Id. at 23-24; id. at 8-11 (9:22 - 10:3, 14:10-18, 15:14-21). IP also guaranteed JPMorgan a $500 million investment management mandate in the Plans, a prize it did not extend to the other bidders. Id. at 8-12 (9:22 - 10:3, 14:10-18, 15:14-21); Exh. 6 at 7. IP awarded JPMorgan the contract for Plan administration in April 2002, even though: 1) it had no experience with a plan the size of IP's; and 2) it charged higher fees than other bidders. Exh. 1 at 109-10 ¶25; exh. 13 at 23; id. at 8-12 (9:22 - 10:3, 14:10-18, 15:14-21).[12]

IP recognized that the proposal offered "JPM considerable opportunity in terms of revenue from investment management fees" and presented JPMorgan "an opportunity to gain more revenue." Exh. 13 at 24. Pursuant to the plan to benefit JPMorgan, and thus IP, at the expense of plan participants, IP structured new plan investment options "to create investment management opportunities" for JPMorgan to generate $2 million in additional investment management fees and enough total fees to meet JPMorgan's "$8MM requirement." Id. at 28-30. In return for the business it steered to JPMorgan, IP got "relationship discounts" from JPMorgan, none of which went to the 401(k) Plans. Exh. 15 at 30 (329:4-9), 33-35 (332:2 - 333:13, 334:8-17).

Besides being steered around the other bidders, the contract IP ultimately awarded to

---

[12] JPMorgan also had questionable competence in administering multiple benefit formulas and had no detailed plan for quality assurance, additional factors that militated against awarding JPMorgan the contract. Exh. 1 at 109-10 ¶25.

JPMorgan was also unreasonable because it provided for a termination fee that was more than

JPMorgan's conversion costs, provided for an unreasonable termination notice period, and

because it was excessively expensive for a plan of IP's size, as demonstrated by the fee reduction

after this case was filed. Exh. 6 at 64-65;[13] 29 C.F.R. §2550.408b-2(c); exh.1 at 11-18.[14]

In addition to the recordkeeping contract, IP awarded JPMorgan management of all the

new SmartMix investment options, partial management of three of the new Core Funds

investment options, and management of the brokerage window, all of which piled on additional

fees for JPMorgan, as IP wanted to do. App. 594, 598, 605, 757. This arrangement provided

JPMorgan fees that were unreasonable, in the opinion of experienced, independent fiduciaries.

Exh. 1 at 11-18, 26-65, 81-82 ¶21, 112-13 ¶33, 116 ¶43; Exh. 5 at 11-14 ¶¶17-20.[15] JPMorgan

got the most favorable fee arrangement of all managers in the Core Funds. Exh. 5 at 13-14 ¶20.

Further, *IP's own advisor* repeatedly recommended removing JPMorgan from the Large Cap

Pool, yet IP did not do so. Id. at 14-15 ¶21; e.g., exh. 39 at 9 ("sell").[16]

In addition to the "relationship discounts", IP got another benefit from steering business

to JPMorgan: consistent "buy" recommendations on IP stock, despite its abysmal performance.

JPMorgan rated IP stock a "buy" or "overweight" from 2000 through 2008. Exh. 5 at 4-5 ¶3. The

SEC sanctioned JPMorgan *for this very practice* with other clients in 2003, resulting in a fine of

---

[13] Exhibit 6 includes the opinions of Plaintiffs' expert David Witz, an independent ERISA fiduciary with over 26 years of experience in investment, plan design, administration, and fiduciary consulting. Exh. 6 at 68.

[14] Opinion of fiduciary expert Al Otto. See note 8.

[15] Exhibit 5 includes the opinions of Plaintiffs' expert Ross Miller, Clinical Professor of Finance, Ph.D. in Economics (Harvard '79), and former head of quantitative research at GE. Exh. 5 at 23.

[16] As to JPMorgan's management of the fixed income fund, IP was advised to "consider alternatives." Exh. 39 at 14.

$80 million.[17] Id.; Exh. 1 at 17-18 ¶51; exh. 7 at 26 ¶66.[18]

4. Securities Lending. Defendants used 401(k) Plan assets in a securities lending program. Although the assets used belonged to 401(k) participants, the revenues generated from that program were diverted to IP's Pension Plan. This claim is described in detail in Plaintiffs' Motion For Partial Summary Judgment (Doc. 253). Defendants do not address this claim in the Motion, thus summary judgment cannot be granted to them on this claim.

5. Large Cap Stock Fund. In 2002, Defendants imprudently converted the Plans' Vanguard S&P 500 Index fund, an inexpensive passive investment, into an actively-managed imprudent fund that charged excessive fees and underperformed. Defendants made that transition without a prudent process to cause them to believe they would beat the market. Exh. 5 at 6-21.[19] Had Defendants instead prudently maintained that investment option in an index fund with appropriate fees, the Plans and plan participants would have gained an additional $58 million to $69.4 million. Id. at 17-21, 52-58. After converting this fund to an imprudent one, Defendants altered the investment strategy of the fund, so that its risk characteristics were more similar to a mix of large and small cap companies, such as the Russell 1000 Index. Id. at 13-17. Defendants expanded the Fund to 900 stocks, making it more like the 1000 stocks in the Russell 1000 Index than the 500 stocks in the S&P 500 Index. Exh. 40 at 5. Despite taking on higher risk and adding more stocks, Defendants misled participants by continuing to use the S&P 500 index as the fund's benchmark. That overstated the relative return of the fund and concealed the fact that the fund significantly underperformed the Russell 1000 Index, which it more closely resembled.

---

[17] See http://www.sec.gov/litigation/litreleases/lr18114.htm.

[18] Although Defendants claim that certain other analysts provided "buy" ratings on IP stock in certain years, MIS at 19, App. 1047-49, the only analyst to continuously provide a positive rating on IP stock over an eight year period was IP's strategic partner - JPMorgan. Prudential, Morgan Stanley, Lehman, and Bank of America all downgraded IP stock from 2001-2006. App. 1047-49.

[19] Analysis of Ross Miller, Ph.D. See note 15.

Exh. 5 at 16-17 ¶25. Defendants do not challenge this claim in the Motion and therefore are not entitled to summary judgment on it.

      6. <u>Company Stock Fund.</u> The details of Defendants' breach of their duties regarding the Company Stock Fund component of the Plans are provided in Part V below at 14.

      7. <u>Stable Value Fund.</u> Defendants provided Plan participants improper benchmarks by which to judge the performance of the Plan's Stable Value Fund. Exh. 5 at 17 ¶26; exh. 3 at 6-7 ¶¶9-10. Defendants used a money market fund benchmark. App. at 628, 671-72, 707-08, 534-35, 734-44, 777-78, 817. That was inappropriate, because a stable value fund is designed to provide greater income with the same preservation of principal as a money market fund. Over time, a stable value fund should always outperform a money market fund. Exh. 14 at 32 (276:14-21); exh. 5 at 17 ¶26. By using a money market fund as the benchmark, the Stable Value Fund appeared to have superior performance. Exh. 3 at 6-7 ¶10. In fact, compared to the benchmark by which Defendants themselves judged the Fund (but concealed from participants), the Fund underperformed. <u>Id.</u> at 7-8 ¶¶12-13. Because of the misleading benchmark, Defendants induced participants to invest an excessive amount of their retirement accounts in the Fund. Exh. 3 at 6-7 ¶10; Exh. 7 at 11 ¶29. Defendants do not address this claim, and thus cannot obtain summary judgment on it.

      8. <u>Misrepresented historical performance</u>. In 2002 Defendants added new investment options to the Plan. However, in advertising those options to participants, Defendants presented performance histories that were wholly contrived and made the options appear to have a history of successful performance. That false history of success obviously induced participant investment in those options, which then generated asset-based fees for IP and its conflicted partner JPMorgan. This claim is described in detail in Part VI below at 25.

9. <u>Withheld contributions.</u> IP improperly delayed crediting participant 401(k) contributions to their accounts, instead keeping them and interest thereon for its own benefit. This cost participants over $6 million. Exh. 1 at 20-22, 26-27; exh. 15 at 6-11 (35:19 - 36:21, 37:23 - 40:14); exh. 14 at 18-21 (71:13-18, 73:5 - 75:12). Defendants do not address the substance of this claim, and thus cannot obtain summary judgment on it.

## IV.     <u>DEFENDANTS' ARGUMENTS ARE INVALID.</u>

Defendants misstate Plaintiffs' claims in Parts II and III of their memorandum. MIS at 14-20. Plaintiffs are not contending that Defendants breached their fiduciary duties *because* the 401(k) Plans underperformed IP's Pension Plan. Instead, Plaintiffs contend Defendants did not fulfill their fiduciary duty in operating the 401(k) Plans and that it was highly unusual, far different from other plans, and thus probative of Defendants' breach of fiduciary duties that the 401(k) Plans so significantly underperformed the Pension Plan, by $2.3 billion (over 4% per year). Exh. 3 at 10 ¶¶25-26.[20] Generally, a company's 401(k) plan performs within 1% of its pension plan. <u>Id.</u> This is confirmed in a study published by the Center For Retirement Research at Boston College. Alicia H. Munnell et al., "Investment Returns: Defined Benefit vs. 401(k) Plans" (Sep. 2006, no. 52), filed herewith as exh. 4.[21] That should especially have been the case with IP's 401(k) Plans, since many of the Plans' investment options were invested in the same pools as IP's Pension Plan. App. 589. The anomalous disparity in performance was not the result of poor investment decisions made by Plan participants, as Defendants suggest. Only one-third of the disparity can be attributed to the performance of the investment options in the 401(k) Plans. Exh. 3 at 12-16 ¶¶32-46. This also is confirmed by the Center For Retirement Research Study. Exh. 4. If 401(k) participant choice were the explanation for the massive disparity

---

[20] Analysis of Steven Pomerantz, Ph.D. See note 10.

[21] Available at http://crr.bc.edu/briefs/ investment_returns_defined_benefit_vs._401_k_.html.

between the returns of the two Plans, such a wide disparity would be disclosed in the Study. This disparity presents, at a minimum, a factual question as to Defendants' imprudence. According to expert opinions herein, two-thirds of the disparity was caused by (1) Defendants' misrepresenting the performance of the Stable Value Fund, which induced additional investment in that low yielding option, and (2) locking in participant investment in the Company Stock Fund and misrepresenting the performance of that Fund, which induced additional investment in that poorly performing option.[22] Exh. 3 at 13 ¶39. In fact, the Company Stock Fund held over half of Plan assets. Exh. 11 at 6 (197:17-25), 10. The Stable Value and Company Stock Funds, both funds whose performance was deliberately misrepresented by Defendants, ended up with the bulk of 401(k) Plan money, up to 73% of Plan assets. Exh. 24 at 17.

The disparity in performance also is explained by the fact that IP had *no* investment policy for the 401(k) Plans, even though Plan documents required an investment policy. Doc. 253-2 at 46-48 §14.01(a)(i). IP had an extensive written investment policy for its Pension Plan, where its own money was at stake. Exh. 32; exh. 1 at 18-19 ¶54, 95 ¶62. The Department Of Labor strongly encourages the use of an investment policy statement. 29 C.F.R. §2509.94-2(2); exh. 1 at 9 ¶21. Because of the absence of an investment policy statement, Plan fiduciaries lacked sufficient guidelines to deal with the problem of excessive fees in the Plans and selected unproven funds and service providers for the Plans. Exh. 1 at 5-6 ¶9, 20 ¶¶ 59, 61.

Another remarkable fact explaining the vast underperformance of the 401(k) Plans is that, for years, IP placed *no priority* on the 401(k) Plan funds outperforming their benchmarks, while placing 60% priority on the Pension Plan outperforming its benchmarks. Exh. 15 at 12-16 (94:19 - 95:3, 98:22 - 99:20, 100:11-16), 18-20 (102:6-14, 103:23 - 104:18), 35; exh. 3 at 11 ¶28. When

---

[22] The Company Stock Fund is discussed in detail in Part V above at 14.

Defendants finally decided to give *any* priority to performance of the 401(k) Plans, they made it *only 1/6* of the priority of the Pension Plan. Exh. 15 at 20-25 (104:22 - 105:25, 106:18-23, 107:17 - 109:22), 28; exh. 3 at 11 ¶29. Of course, in the Pension Plan it was IP's assets that were on the line. In the 401(k) Plans, it was only the assets of IP's employees that were on the line.

Had Defendants devoted attention to the investments included in the 401(k) Plans to the same extent they devoted attention to the Pension Plan, the 401(k) Plans should have provided returns more within 1% of the Pension Plan. Had that occurred, the 401(k) Plans would have earned an additional $2.28 billion in retirement savings for Plan participants. Exh. 3 at 10-11 ¶27. That would not have required including hedge funds and real estate holdings, as Defendants argue. Id. at 13 ¶¶39-40. Properly managing the Company Stock and Stable Value Funds alone would have accounted for two-thirds of that difference. Id.  Defendants are not entitled to summary judgment on Parts II and III of their Memorandum.

V.    DEFENDANTS IMPRUDENTLY MANAGED THE COMPANY STOCK FUND

Defendants misconstrue the Company Stock Fund claim as being merely about whether they had a duty to diversify this Fund. MIS at 7-14 (Part I). A proper understanding of this claim reveals Defendants' error and the invalidity of their argument. Defendants imposed restrictions on the 401(k) Plans that forced participants into excessive concentration of their retirement assets into the Company Stock Fund. See part A below. Defendants recognized IP stock was an imprudent investment and dropped it from IP's Pension Plan, but kept it in the 401(k) Plans. See part B below. Defendants not only concealed that information from 401(k) Plan participants, they also provided participants misleading benchmarks to conceal the imprudence of investment in the Company Stock Fund. See part C below.

A.    Divestiture restrictions. IP made its match of employee contributions to the Plans only in the form of IP stock held in the Company Stock Funds. Exh. 14 at 22 (92:15-21), 27-28

14

(106:18 - 107:25). The Plans not only made matching contributions in IP stock, the portion of the share of the employee's *own* contribution that was matched by IP *also* had to be invested in IP stock. App. 892.[23] Thus, the vast bulk of participant contributions were restricted to IP stock. Exh. 14 at 36. Further, IP employees could not sell the restricted IP stock until age 55, and even then, they could only divest 20% per year. App. 254, 257; exh. 14 at 23-24 (95:8-25, 99:2-19). Thus, participants were coerced into holding IP stock in order for them to be in the 401(k) Plans. At one point, the Company Stock Fund held 57% of Plan assets. Exh. 14 at 6-9 (11:11 - 13:3, 31:5-19), 35. Almost a third of employees had 90% or more of their retirement accounts in the Fund. Id. at 9 (31:20-24); App. 894. Defendants recognized such a large proportion of plan assets held in company stock vastly exceeded the average allocation to company stock in other plans. Exh. 14 at 35.

Mr. Hunkeler recognized the risk of such excessive restrictions, resulting in participant portfolios "too concentrated in Company stock," and the need for "a *rational* policy on Company stock investments". Exh. 14 at 34-37 (emphasis added); App. 890. Hunkeler further recognized:

> - IP's transfer restrictions disproportionately disadvantage long-service employees.
> - A savings plan is not the right medium for conveying employee ownership.
> - IP's transfer restrictions create a potential legal liability that is avoidable.

App. 891. Hunkeler and IP's trust department further recognized:

> Diversification is one of the fundamental principles of investing. Diversified portfolios result in higher returns with lower risk. To the extent that IP employees are not allowed to adequately diversify their portfolios, they run a greater risk that their retirement savings goals will not be met.

App. 894. Defendants thus recognized that even though ERISA exempts a company stock fund *itself* from the duty of diversification, 29 U.S.C. §1104(a)(2), prudent fiduciaries must

---

[23] Defendants did not produce this document until December 5, 2008, the last day of discovery and long after Plaintiffs had deposed all witnesses, particularly Mr. Hunkeler. Exh. 41.

nonetheless ensure that the company stock fund structure does not undermine participants' ability to prudently diversify their other accounts. The trust department understood the Plans were IP employees' predominant source of retirement income. App. 898. However, Hunkeler recognized,

> the Plan discourages the prudent management of those assets. If we wish to help our employees secure a comfortable retirement in the "new world" of waning employer paternalism, we must encourage them to manage their money wisely, Promoting the benefits of diversification is an important first step.

App. 898.

Although Hunkeler recognized the importance of promoting diversification to participants, IP's restrictions prevented him from taking that "important first step." As he acknowledged, "Clearly, it is difficult to talk about the benefits of diversification when our own plan doesn't permit it." App. 900.

Hunkeler also informed the other Defendants and IP that the goals of employee company stock ownership and provision of retirement savings were incompatible. App. 904-05. Retirement plans are supposed to provide income. Employee company stock ownership aligns employees' interests with their employers.

> Non-retirement goals should be met in ways that do not interfere with a savings plan's retirement income provision function. The goal of employee ownership is better conveyed through more direct means . . . . Public companies rarely view their savings plans as part of an effort to create an ownership culture.

Id. Hunkeler recognized these factors all presented risks to participant retirement savings and consequent risk of liability to IP. App. 905. Thus, Hunkeler suggested, "given the questionable effectiveness of employee stock ownership programs, one has to question whether it isn't wiser to simply avoid the risk altogether." Id.

Hunkeler's conclusions were confirmed by (indeed based on) the findings of the Working

Group of the DOL's Advisory Committee. Exh. 25.[24] The findings confirmed, "*Employers who have directed the investment of participant balances into employer assets will face serious fiduciary issues*." Id. at 3. Holding even 33% of plan assets in company stock was "alarming".

Id. at 10. In plans where employer contributions were limited to company stock,

> the investment risks rests with the participant without the concomitant ability to manage the investments. . . . It is difficult for workers to manage their retirement savings prudently when defined contribution assets can be invested with no limit in employer assets, and the worker has no ability to diversify.

Id. "Denying participants the right to diversify their qualified account balances while placing on their shoulders the obligation to save for retirement is woefully unbalanced." Id. at 11.

> The most disturbing factor is the participants' degree of dependence on a single asset whose value is closely linked to that of the participant's other principal financial standby: his or her job. If a company runs into problems, the participant with 33% of his pension assets in company stock faces a double problem: Not only is his job in jeopardy, but so is a high percentage of his pension.

Id. at 10. See also Susan J. Stabile, *Pension Plan Investments In Employer Securities: More Is Not Always Better*, 15 YALE J. REG. 61, 79 (1998).[25] Investment advisers "generally recommend investing no more than 5% to 15% of an investment portfolio in any single stock." Id. at 82, exh. 38 at 22.[26]

Even Towers Perrin Company, service provider to the Plans until 2002, indicated that company stock funds are "fine so long as that portion is within reason" and "there is a conflict when a significant portion of plan assets is invested in employer stock." Exh. 25 at 22. Furthermore, Towers Perrin stated that "participants whose contributions are mandatorily

---

[24] Available at http://www.dol.gov/ebsa/publications/acemer.htm. Referred to in Hunkeler's internal memorandum at App. 906.

[25] Exh. 38 at 19. Referred to in Hunkeler's internal memorandum at App. 904.

[26] More recently, the Wall Street Journal noted, "Retirement experts generally recommend that workers keep no more than 5% to 10% of their balances in company stock -- and many believe such shares don't belong in retirement plans at all." Eleanor Laise, *Despite Risks, Workers Guzzle Company Stock*, WALL ST. J., Mar. 5, 2009, exhibit 47 at 2.

invested into employer securities may not understand how to properly allocate their other retirement assets." Id.

Contrary to the recommendation of its own Vice President and Plan fiduciary, IP did not choose "to simply avoid the risk altogether" of employee stock ownership in the 401(k) Plans. Instead, IP and Defendants kept in place their coerced company stock ownership requirement, only gradually loosening the restrictions on employee divestiture. Starting in 2002, participants could sell only half their matching contribution of IP stock. Id. at 25-26 (100:24 - 101:10); exh. 11 at 6 (197:17-25), 9, 14. The other half still had to stay in IP stock until age 55. App. 194. Only in 2005 did IP allow all participants to divest themselves of the matching IP stock, although, even then, the match was made in IP stock and the participant who preferred another investment had to sell that stock (possibly at a loss) and then redirect the proceeds into other investments. Exh. 14 at 29 (118:11-25). Only in 2008, after this lawsuit was filed, did IP stop making its matching contributions in IP stock. Id.; exh. 26.[27] These gradual changes were designed to ensure that only one-third of Plan holdings in IP stock was affected. App. 893. Hunkeler recognized that these changes were necessary to "provide employees the opportunity to diversify their investments for a safe and secure retirement." Exh. 14 at 39. Hunkeler offered no reason why, once Defendants apparently recognized their massive and costly fiduciary breach, it took many years and until after this lawsuit to stop.

It is apparent one concern was to ensure participants did not sell their IP stock too quickly, which would "depress IP's share price." App. 891. Defendants thus were more concerned for IP's own stock value than what was best for participants, a breach of their duty of

---

[27] However, in March of this year, IP went back to providing matching contributions in company stock. Exh. 47 at 2 ("International Paper Co. this month began making 401(k) matching contributions in company stock rather than cash, says Robert Hunkeler, the company's vice president for investments).

exclusive loyalty to Plan participants. 29 U.S.C. §1104(a)(1)(A). In addition, IP gained a benefit

for itself from this structure of the Stock Fund. Employers put company stock in retirement

accounts with the expectation the shares will be "in hands perceived to be friendly to

managements' interests." Exh. 38 at 2; see also id. at 30. Despite the gradual liberalization, the

percentage of plan assets in the Company Stock Fund only declined to 27% in 2002, still more

than the 15% maximum recommended by investment advisers. Exh. 14 at 6-8 (11:11 - 13:3), 40;

exh. 11 at 6 (197:17-25); exh. 38 at 21-22. Defendants cannot credibly contend there are no

material facts at issue with respect to this coerced, long term holding of company stock. In fact,

Defendants have cited no facts whatsoever to suggest how either forced holding of company

stock or prohibition on selling it can ever be in plan participants' interest. These are powerful

facts that preclude summary judgment for Defendants on the coerced holding of company stock.

       B.  Defendants recognized that IP stock was an imprudent investment. Hunkeler

recognized that even though ERISA allows inclusion of company stock funds in retirement

plans, the fiduciaries nonetheless

> must ensure that the merits of the investment in company stock are continually
> evaluated as a suitable means to provide an employee benefit *just like they must
> for any other investment*. Failure to do so could render such fiduciaries fully liable
> under ERISA.

App. 905 (emphasis added). As Mr. Hunkeler stated, "I believe it is one of my duties as a

fiduciary to evaluate the funds that are offered to the participants, to ensure that they are properly

diversified, and try to ensure that they remain prudent investments." Exh. 14 at 13 (47:3-19).[28] In

his role as a fiduciary in the Pension Plan, where IP's well-being was at stake, Hunkeler did

analyze the prudence of IP stock as an investment. While wearing his fiduciary hat in the

---

[28] See also App. 25, 116 (§7.01) ("The Plan Financial Officer may, from time to time, at his discretion, change the available investment funds").

Pension Plan, he found that IP stock was an *imprudent* investment because it did not provide a return commensurate with its risk. They "were not getting the best risk return for that position." Id. at 11 (40:4-14). IP stock did not deliver high returns. Id. at 14-15 (65:24 - 66:8).

Hunkeler's expected poor performance for IP stock proved true. From 2001-2006, IP stock not only underperformed the market, but actually lost value, in contrast to the S&P 500 Index, which gained 6.2%. Exh. 14 at 16 (68:14-25), 17 (70:13-24). Further, it did so while incurring far greater risk. The risk of loss of an investment in IP stock was *over double* that of an investment in the S&P 500. Exh. 8 at 7-8 ¶¶7-8, 26.[29] From 1995 through 2007, on an annualized basis, IP stock was out-gained more than 4 times by the S&P 500, whose total gain over that time was over 300%. Id. at 12 ¶15. Even more incredibly, from 1992 through 2007, IP stock had a *negative* return, while the S&P 500 gained over 250%. Exh. 7 at 17 ¶45, 39. On an annualized basis, IP stock gained only 2.6%, compared to 11.3% for the S&P 500. Exh. 8 at 12 ¶15. Even short term U.S. Treasury bills returned 4% over that time, nearly double the return of IP stock. Id. at 12 ¶15. IP stock did not even equal the rate of inflation, while putting participants at great risk of loss.[30]

Because of the poor historical and expected performance of IP stock, Hunkeler recommended that IP divest out of IP stock altogether *in IP's Pension Plan*. Exh. 28. IP even eliminated stock options for company executives. Exh. 15 at 26-29 (177:22-178:7, 182:16-183:24), 85; Exh. 7 at 19 ¶50. However, while wearing his fiduciary hat as head of the employees' 401(k) Plans, *Hunkeler did the opposite – he did not recommend divesting out of IP*

---

[29] Exhibit 8 includes the opinions of Plaintiffs' expert Edward O'Neal, a Ph.D. in Finance and M.B.A., and formerly Assistant Professor of Finance and Senior Research Economist with the S.E.C. Exh. 8 at 20-24.

[30] A good depiction of IP Stock's vast underperformance is shown in exh. 3 at 36, from the analysis of Dr. Pomerantz. See note 10.

*Stock and participants knew nothing of his contrary recommendation for IP's Pension Plan.*
That is so even though Hunkeler recognized that IP's volatility rendered it a worse investment than the S&P 500. App. 899-900. Hunkeler dismissed this neglect of 401(k) Plan participants by stating, "that is a participant's decision whether to hold company stock or not." Exh. 14 at 12 (42:6-8). Of course, participants were denied the ability to sell all of their IP stock until 2008, after the filing of this case. As to the stock they could sell, participants could not have known of the need to dispose of IP stock unless they were provided the same information their fiduciaries knew: the fact that IP stock did not provide a return that justified its risk. Defendants offer no evidence that participants were told and as set forth below, they were deliberately misled. Defendants have wholly failed to prove undisputed material facts in their favor regarding the imprudence of Company Stock Fund.

     C. <u>Misleading benchmarks.</u> Defendants did not provide the critical information which it had and which participants needed - that they had decided to dump company stock from IP's Pension Plan because its risk did not justify the expected return. Instead, Defendants deliberately provided misleading benchmarks that created the impression that IP stock in fact performed well. Defendants provided as the benchmark for comparing the performance of IP stock not the S&P 500 index, of which IP was a component, but instead the "S&P Paper and Forest Products Index" and later the "S&P 500 Materials Index".[31]  App. 642, 690, 726, 762, 795, 835; Exh. 8 at 11 ¶14; Exh. 3 at 8 ¶16. Those indexes performed poorly relative to the general market and thus disguised the poor performance of IP stock. Exh. 3 at 8 ¶¶16-18. Had Defendants provided participants the S&P 500 index as a benchmark, participants would have seen how badly the

---

[31] For their own purposes, Defendants used the S&P 500 index. Exh. 21 at 2; Exh. 20 at 3; Exh. 3 at 36-37 ¶ 6.

Stock Fund underperformed. E.g., exh. 21 at 2.[32]. In addition, knowing they rejected owning their own stock in their own Pension Plan because of its poor return potential, Defendants falsely stated to participants that the return potential of IP stock was "High."[33] This was stated despite the fact that IP's return had been persistently "abysmal", Exh. 5 at 11-12 ¶17, n.25, and even though Hunkeler found IP's return to be not only poor but outweighed by its risk. Those misleading representations seriously harmed participants.[34]  Exh. 8 at 11 ¶14; Exh. 3 at 8 ¶¶16-18.

Defendants recognized that the Fiduciary Review Committee had a conflict of interest in making any decision regarding the removal of IP stock from the 401(k) Plans. It "was viewed as a conflict of interest to have directors of [IP] be responsible for decisions made with regard to the company stock . . ." Exh. 16 at 7 (62:16-25). Nonetheless, the Fiduciary Review Committee was not removed from that role and conflict of interest until 2004. Id. at 5-6 (59:15 - 60:19). The 401(k) Committee took over that role, but Defendants provided no evidence that Committee was presented all of the above reasons for removing IP stock from the 401(k) Plans altogether, much less that participants were provided this information. Exh. 17 at 5-6 (220:24 - 221:13). The 401(k) Committee did not even look to Mr. Hunkeler to provide that information, instead believing that was State Street's role. Id. at 6-7 (221:14 - 222:17). State Street, however, did not see its role as recommending any divestiture of IP stock unless the company was "an imminent

---

[32]  Comparison of one year, three years, and five years annualized returns as of Dec. 31, 1997:

| | | | |
|---|---|---|---|
| COMPANY STOCK | 8.8% | 7.1% | 7.8% |
| SP500 Index | 33.2% | 31.1% | 20.2% |

[33]  App. 590, 642, 690, 726, 762, 795, 835.

[34]  The misrepresentations also constitute fraudulent concealment of these breaches of fiduciary duties.

bankruptcy, or there's a serious question about the company's viability."[35]  Exh. 18 at 5 (43:2-21). Cf. Steinman v. Hicks, 352 F.3d 1101, 1106 (7th Cir. 2003) ("impending collapse" is not the requirement for restructuring an ESOP).

Defendants' failure to do for the 401(k) Plans as they did for IP's own Pension Plan cost participants nearly $2 billion. Exh. 8 at 13-14¶¶17-18, 28.[36]

Although a fiduciary is not required to diversify the ESOP portion of a 401(k) plan, 29 U.S.C. §1104(a)(2), the fiduciary nonetheless continues to owe duties of loyalty and prudence regarding the purchases of company stock and administration of the company stock fund. Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951, 955-56 (D.C.Cir. 1985)("the requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the interest of plan participants continue to apply"), cited in Steinman, 352 F.3d at 1106. The fiduciary's investment decisions "are subject to the closest scrutiny under the prudent person rule, in spite of the strong policy and preference in favor of investment in employer stock." Fink, 772 F.2d at 955-56 (quotes omitted).

> The duty of an ERISA trustee to behave prudently in managing the trust's assets, which in this case consisted of the assets of the ESOP, is fundamental. This is true even though, by the very nature of an ESOP, the trustee does not have a *general* duty to diversify, though such a duty can arise in special circumstances.

Armstrong v. LaSalle Bank N.A., 446 F.3d 728, 732 (7th Cir. 2006). Release from the general duty to diversify "does not eliminate the trustee's duty of prudence." Id. "*If anything, it demands an even more watchful eye . . . to be especially careful to do nothing to increase the risk faced by the participants still further.*" Id. (emphasis added). Moreover, despite §1104(a)(2), the fiduciary's general duties of prudence and loyalty requires selling of company stock under

---

[35] At that point, of course, the stock would have lost nearly all its value and State Street's sell recommendation would have been of minimal value.

[36] Analysis of Dr. O'Neal. See note 29.

circumstances short of the "impending collapse" of the stock. <u>Steinman</u>, 352 F.3d at 1106.[37]

Hunkeler himself recognized these legal obligations in 1998 when he noted the risks of the

conflicting policies from including employee stock ownership in retirement accounts. See *supra*

at 16.

While §1104(a)(2) exempts a fiduciary from the duty to diversify the *ESOP portion* of a

plan, that does not allow fiduciaries to prevent participants from diversifying their retirement

accounts. Defendants knew a very high proportion of Plan assets were locked into IP stock

because of their coercion of participants but took no efforts to remedy that breach. 29 U.S.C.

§1105(a).

Defendants entirely miss the point of Plaintiffs' argument in citing a number of cases that

have held that a drop in company stock *per se* is not proof of the imprudence of keeping

company stock in a retirement plan. Cf. MIS at 8-13. Plaintiffs do not contend Defendants'

management of the Company Stock Fund was imprudent *merely because* it fell in price.

Defendants themselves as fiduciaries for the Pension Plan determined that IP stock was

imprudent because its potential return did not justify its risk. That IP stock in fact did

subsequently drop in price is merely proof of the accuracy of Defendants' analysis for its own

account and a measure of Plaintiffs' damages.

Defendants contend that since certain Plaintiffs participated in IP's Pension Plan, the

excessive concentration in IP stock may not have damaged them. MIS at 12. No salaried

employees after 2004 received any benefits from the Pension Plan. Exh. 14 at 10 (36:2-14). This

claim is not about individual plaintiffs' accounts, however, but rather about the damage to the

---

[37] Contrary to Defendants' claim, Judge Posner did not list the exclusive facts under which a fiduciary must sell company stock. <u>Steinman</u>, 352 F.3d at 1106; cf. MIS at 10 ("a duty to diversify the employer's securities would be triggered in an EIAP *only if* :")(emphasis added).

Plans as a whole from the coerced high concentration in IP stock, misrepresentations that masked the true underperformance of IP stock, and the failure to divest from IP stock after Hunkeler determined it was an imprudent investment and did exactly that in the Pension Plan. Furthermore, Defendants provide no evidence that any Plan fiduciary actually analyzed whether enough participants were entitled to enough defined benefits out of the Pension Plan to justify Defendants' operation of the Stock Fund.[38] They also cite no authority suggesting that such an analysis would have excused their misconduct. Thus, Defendants are not entitled to summary judgment on the Company Stock Fund claims.

## VI.    FRAUDULENT PERFORMANCE HISTORIES OF NEW FUNDS

Defendants added new investment options in the Plans in 2002 called "SmartMix" and "Core Funds". App. 587. IP picked its favored manager, JPMorgan, as the sole investment manager for the SmartMix Funds, which JPMorgan then invested in its own funds, generating more fees for itself as part of the conflict of interest described above at 7-10. Exh. 15 at 31-32 (330:16 - 331:6); App. 596, 619.[39]  The "Core Funds" were operated as a "fund of funds", each core fund containing multiple investment funds with the same investment objectives. App. 587. Those advisers were paid fees for that investment management in the form of a percentage of the assets invested in the Funds. The more participants invested in the Funds, the more those advisers received in fees. Among those investment advisers was, again, JPMorgan. App. 598, 605, 757.

---

[38] The Seventh Circuit's recent opinion in Hecker v. Deere & Co., Nos. 07-3605 & 08-1224 (7th Cir. Feb. 12, 2009) does not affect this claim because the Company Stock Funds were not publicly traded mutual funds and no prospectus disclosed the information Defendants knew about the Funds' imprudence. In addition, the Company Stock Funds claim does not concern mutual fund fees, the issue addressed in Hecker. Slip op. at 17-22. In addition, 29 U.S.C. §1104(c) is not at issue in Defendants' Motion. Cf. id. at 22-30.

[39] "JPMorgan Fleming" was the "marketing name" for JPMorgan. App. 619.

Defendants deceptively created, and provided in participant communications, "reconstructed" returns of these funds. On the Fund Performance page of their new Investor's Guide, Defendants presented one-year, three-year, five-year, and ten-year "annualized performance of each fund" for the thirteen funds in the Plan "as of September 2001", *even though the funds were not available until April 2002*. App. 593. In a footnote at the bottom of the page, Defendants noted, "Certain of the funds have not been in existence for the full time period shown. See the back panel of this brochure regarding the calculation of the performance shown." Id. Only *27 pages later* would a participant have discovered that, in fact, *all but two* out of thirteen funds had not "been in existence." App. 619. There is no dispute of fact that this highly deceptive participant communication occurred, and Defendants do not deny it.

The "Disclosure Statements" page does not disclose that *many of the eleven "reconstructed" return funds did not even exist for three, five, or ten years*, inside or outside the Plans. Thus, critically, Defendants did not disclose that the returns they provided to participants to induce investment in the new funds, *were entirely made up*. Of course, it is no surprise that nearly every contrived past performance for the new funds shows a gain over its benchmark. App. 619; Exh. 5 at 18 ¶28; Exh. 6 at 52 ¶29(d)(i)(2).

IP compounded this cover-up of the nonexistence of the vast majority of the funds by suggesting that performance information "was not available" instead of saying that the funds did not exist. App. 619. For example, the "Disclosure" for the SmartMix Funds states:

> During periods when historical performance was not available, the returns of a composite of JPMorgan Fleming accounts following the same strategy or the returns of a similar strategy in the same asset class were used.

App. 619. This is convoluted description does not identify any specific funds used in the "composite" or how they were arrayed in the "composite." As to the reconstructed returns of the Core Funds, the "Disclosure" even more vaguely states:

> the reconstructed returns were calculated using the mix of investment managers that existed when the portfolio strategy was first introduced in the IP pension plan and the individual return histories of those managers, adjusted for fees.

Id.[40] Both these statements provide no meaningful information on how returns were calculated and how they relate to the actual funds included in the 401(k) Plans. They do not indicate what performance histories or funds were used. Defendants apparently weighted the mix of performances of the individual managers in each multi-manager Core fund based on how much was allocated to each manager when the Plans' investment in the funds first started *in the Pension Plan*, even though those allocations subsequently changed and were different for the 401(k) Plans. Exh. 8 at 15-17 ¶21, ¶23. At a minimum, there are certainly substantial factual issues as to whether Defendants accurately used a composite of the appropriate accounts of each manager. Exh. 8 at 15¶20.[41]

Further, Defendants' methodology violated industry standards as set by the Performance Presentation Standards of the Association for Investment Management and Research. Exh. 9 at 19-20 (§3);[42] exh. 8 at 16 ¶22; exh. 6 at 35-36 ¶26. Apart from the cover-up of the Funds' lack of existence for years, the methodology for "reconstructing" these returns was so vague and inaccurate, not even the most knowledgeable investment professional could understand it. Exh. 5 at 18 ¶28.[43] No prudent fiduciary would have used such "reconstructed" performance figures. Exh. 1 at 23 ¶71, 93¶¶50-52; exh. 3 at 9-10 ¶¶22-24; exh. 5 at 18-19 ¶¶28-30. In sum, the

---

[40] Similarly confusing and misleading statements were included in Year In Review documents in following years. E.g., App. 692.

[41] Each investment adviser who participated in the Core Funds was required to keep detailed records of the past performance of each account it managed. 17 C.F.R. §275.204-2(a)(16). Therefore, specific information on the performance histories used to "reconstruct" returns on the Core Funds was available and could have been disclosed (if, in fact, that is what Defendants used for their "reconstructed" returns).

[42] Available at http://www.swissbanking.org/en/aimr_pps_us_canadian.pdf.

[43] Ross Miller has a Master's and Ph.D. in economics from Harvard Univ., is a clinical professor of Finance, and was head of quantitative finance research at General Electric. Exh. 5 at 23.

performance histories were contrived and misleading. Defendants should have reported nothing but the actual history of the Funds in the Plans together with the honest disclosure that these funds were new and had no history on which to base a decision whether to invest in them. Exh. 1 at 93-94 ¶¶54-56.

By reporting contrived, non-existent, but positive performances, Defendants induced participants to direct more of their retirement savings into these Funds, thereby generating more fees. This in turn produced a corporate benefit to IP because of its other business with JPMorgan and JPMorgan's repeated recommendation of IP stock.[44]

Defendants and their conflicted partner JPMorgan would not have received any fees but for the fraudulent performance histories they provided to participants, which showed funds with a fabricated history of strong performance. Plaintiffs' claim is for damages to Plans as a whole from the diversion of Plan investments into the new funds and the consequent enrichment to Defendants and parties in interest of fee income out of those Plan investments that would not have been gained but for Defendants' fraud and breach of their duty of loyalty to the participants. Cf. MIS at 24-25. Restitution of the money Defendants and parties in interest gained from their breaches of fiduciary duties are recognized equitable remedies. 29 U.S.C. §1109(a), §1132(a)(2).[45]  Defendants' dispute about the amount of that remedy is an argument for trial, not summary judgment.

---

[44] Dr. O'Neal lays out the total invested assets and fees for each Plan fund and each year. Exh. 8 at 17-18 ¶24, 29. Contrary to Defendants' suggestion, O'Neal does not provide fee data from any fund past its inception date in the Plans. Cf. MIS at 21-22. As to the calculation of fees earned in funds that *were* in the Plans back to 1997, O'Neal stated only that he was asked for a calculation back to 1997 and had no objection to doing so. App. 1429, lines 7-24.

[45] The recent decision in <u>Hecker</u> also does not affect this claim, since that appeal did not concern contrived performance histories.

VII.     DEFENDANTS MISLED PARTICIPANTS ABOUT FEES

Defendants mischaracterize Plaintiffs' fee claims as mere failure to disclose recordkeeping fees. MIS at 22-23. As described above at 7, and supported by many facts and expert opinions, Defendants breached their fiduciary duties by including investment options in the Plans with unreasonably high investment management fees, not failing to disclose revenue sharing out of those fees. The cases Defendants cite all addressed disclosure of revenue sharing and thus are inapposite.[46]

Defendants point out that they included quantitative information about fees and use that to argue that they did not misrepresent information regarding fees. It is not the amount of the fees that makes Defendants' statements misleading. Rather it is Defendants' *characterization* of the fees combined with wholly inappropriate fee benchmarks and false statements that make their fee disclosures fiduciary breaches. Plaintiffs have produced detailed facts and expert opinions documenting that Defendants did so. Exh. 1 at 97 ¶¶68-69. See Part VI above at 25.

Mr. Hunkeler recognized that retail mutual funds were inappropriate for a multi-billion dollar plan such as this, and thus restructured the investment options in 2002. App. 934. The following exchange in Hunkeler's deposition evidences this:

> Q: Isn't it fair that any three billion dollar plan can get better fees than retail mutual funds, just by its sheer size?
> A: I believe that a large pension savings plan should be able to provide investment options at better than retail price.

Exh. 14 at 30 (187:15-24). Defendants nonetheless gave participants a comparison of the Plans' investment fees to high-priced *retail* mutual fund fees in order to convince participants the Plans'

---

[46] That also was the argument addressed in Hecker, but as to publicly traded mutual funds that had revenue sharing. Hecker, slip op. at 17, 20. Here, the funds were not mutual funds, but separate accounts or commingled funds which are not available on the public market or regulated by the SEC, unlike the mutual funds in Hecker. Id. at 5, 9, 18-21, 27. In addition, in contrast to SEC-mandated prospectuses for mutual funds, Defendants did not break out the components of the fees charged in the Plans funds. Exh. 10 at 15-16 (411:23-412:1); cf. Hecker, slip op. at 18-20, 27. See below at 37.

fees were reasonable. App. 526. ERISA holds fiduciaries to the standard of a prudent investor "acting in a like capacity and familiar with such matters." 29 U.S.C. §1104(a)(1)(B). No prudent $4 billion investor, who is in the jumbo investor market, would buy retail mutual funds designed for small investors. Exh. 8 at 33 ¶5; exh. 5 at 8 ¶10; exh. 1 at 22 ¶69; exh. 6 at 63 ¶1; exh. 14 at 30-31 (187:25-188:13). IP did not have retail mutual funds in its own Pension Plan. Exh. 14 at 30 (187:15-24); Exh. 42 at 4-7. Yet in attempting to convince participants the Plans' investment management fees were reasonable, Defendants used improper benchmarks from a market dramatically different and more high-priced than the market they were in.[47]

Defendants also attempted to justify the high investment management fees by suggesting the investments would "out-perform low-cost index funds, like those offered by Vanguard, Fidelity, and T. Rowe Price." App. 526 (Doc. 255-9). Defendants, however, did not provide those low-cost index funds as benchmarks by which to compare the performance of IP's funds. App. 530, 667, 703, 739, 773, 813.

It is also critical to understand how Defendants characterized these funds to participants. Defendants falsely characterized the funds as having "*great performance*" and "*great fees*." App. 1464. Thus, the fees that were disclosed were characterized as "great", which was patently false. Neither performance nor fees were anywhere near "great": performance was abysmal and fees were excessive. See above at 5-7. Intentionally misleading statements and material omissions are breaches of fiduciary duties. Varity Corp. v. Howe, 516 U.S. 489, 505-06 (1996); Anweiler v. Am. Elec. Power Svc. Corp., 3 F.3d 986, 991 (7th Cir. 1993). ERISA has always required that when  fiduciaries speak, they must speak the truth; lying is "inconsistent with the duty of loyalty owed by all fiduciaries . . ." Varity, 516 U.S. at 506. Defendants' characterizations of the Plans'

---

[47] With its $4 billion Plans, IP was no more in the retail market for purchasing investment services than Enterprise Rent-a-Car is in the neighborhood retail car market when it buys cars. Exh. 8 at 33 ¶5.

fees were both misleading and untrue and were breaches that concealed from participants the excessively high cost of the Plans' investment options. Defendants therefore are not entitled to summary judgment on this issue.

VIII.    <u>STATUTE OF LIMITATIONS</u>

Defendants misstate the law on the statute of limitations under ERISA, 29 U.S.C. §1113. MIS at 26-28. At its shortest, a plaintiff has only three years from the date she gains *actual* knowledge of the breach. 29 U.S.C. §1113. Otherwise, a plaintiff must file within six years after the date of the last act that was a part of the breach or, if a breach by omission, the last date on which the fiduciary could have cured the breach. <u>Id.</u> However, in cases of fraud or concealment, a plaintiff may file within six years after the date of discovery of the breach. <u>Id.</u> Application of the different limitation periods in §1113 "turns on the level of generality employed in characterizing the transaction at issue." <u>Martin v. Consultants & Admins. Inc.</u>, 966 F.2d 1078, 1086 (7th Cir. 1992).

To have "actual knowledge" of a breach, a plaintiff must be aware of "the essential facts of the transaction or conduct constituting the violation." <u>Consultants</u>, 966 F.2d at 1086. The plaintiff "must have had specific knowledge of the actual breach of duty upon which he sues," more than "notice that something was awry." <u>Id.</u>; <u>Radiology Ctr. v. Stifel, Nicolaus & Co.</u>, 919 F.2d 1216, 1222 (7th Cir. 1990). Such material facts "could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." <u>Caputo v. Pfizer Inc.</u>, 267 F.3d 181, 193 (2d Cir. 2001).

An ERISA fiduciary has a continuing duty "to review plan investments and eliminate imprudent ones." <u>Consultants</u>, 966 F.2d at1087-88.

> If knowledge of an ERISA violation barred claims based on similar *future* conduct, this continuing fiduciary duty would be severely weakened, and trustees

31

would be left free to engage in repeated violations, so long as they have once been discovered but not sued.

Id. at 1088 (emphasis in original). Given "ERISA's imposition of a continuing fiduciary duty, past knowledge of a past violation generally should not be held to preclude a suit for a repeated or continued violation." Id. at 1089.

Although cited by Defendants, Leister actually supports Plaintiffs. Leister v. Dovetail Inc., 546 F.3d 875, 880 (7th Cir. 2008); cf. MIS at 28.[48] Defendants' quote omits the predicate for the quote regarding applicability of the three-year statute of limitations. The Court stated,

> It is true there is no indication that she learned then [more than six years before suing] that the defendants would *never* comply with the terms specified in the Adoption Agreement – that they had repudiated the agreement.  Had she learned it then, claims for subsequent failure to match would be barred by the three-year statute of limitations, whereas if every default was pursuant to a fresh decision by the defendants not to comply with the agreement each such decision would be a fresh breach.

Id. (internal cites omitted; emphasis in original). Here, there is no suggestion that Plaintiffs knew Defendants had decided never to perform their fiduciary duties. Moreover, the discussion in Leister of the ERISA statute of limitations is dicta because the Court acknowledged "all this turns out to be of no moment", since the case was governed by a state 10-year statute of limitations. Id.

Limestone and the "continuing violation" doctrine is inapposite, because it does not concern §1113 and is not an ERISA case. Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 799 (7th Cir. 2008); cf. MIS at 28. Plaintiffs need not rely on the "continuing violation" argument in this case, because ERISA expressly commences the limitation period from the last act constituting part of the breach or the last date on which Defendants could have cured a failure

---

[48] Kanawi and Young on §1113 are contrary to 7th Circuit precedent and the majority of district courts. Cf. MIS at 27.

to act prudently. 29 U.S.C. §1113(1).[49]

In light of a correct interpretation of §1113, it is clear Plaintiffs' claims are not time-barred. At a minimum, there are genuine issues of material fact that prevent summary judgment.

A.    Company Stock Fund.

Defendants' argument for a time bar of the Company Stock Fund claim is based on a mischaracterization of the claim as being *solely* about the existence of that investment option in the Plans and the restrictions on contributions into and withdrawals out of that Fund. MIS at 28-31. As indicated in the discussion of this claim in Part V above at 14, that is incorrect. The most important fact that Defendants ignore is that *Defendants determined IP stock was an imprudent investment* but failed to remove it from the 401(k) Plans (even though they removed it from their Pension Plans and stopped using it for executive stock options, see above at 19-21) and hid that fact from Participants. The fact that participants were locked in to the Company Stock Fund exacerbates Defendants' breach and the damages resulting from it: participants were wholly at the mercy of Defendants to prudently manage that Fund, since participants had no choice to get out of the Fund. Defendants do not suggest that Plaintiff failed to exercise diligence or that any diligence could have revealed these decisions. Defendants knew that the restrictions on Company Stock unduly concentrated participant accounts and knew that IP's corporate goal of using the 401(k) Plan to align employees' interests with those of management was incompatible with a prudent retirement plan, Defendants never informed participants of those highly material facts, and, for years, took no measures to remedy the situation.

---

[49] Although their decisions are not precedent, other district courts agree with this conclusion for reasons the Court may find persuasive. Boeckman v. A.G.Edwards Inc., 461 F.Supp.2d 801, 814 (S.D.Ill. 2006) (Murphy, C.J.) ("In light of the continuing duty of prudence imposed on plan fiduciaries by ERISA, each failure to exercise prudence constitutes a new breach of duty, that is to say, a new claim"); Dole v. Formica, 1991 WL 317040 at *7 (N.D.Ohio 1991) (Batchelder, J.); Buccino v. Continental Assur. Co., 578 F.Supp. 1518, 1521 (S.D.N.Y. 1983) (Carter, J.); Mahoney v. J.J. Weiser & Co., 564 F.Supp.2d 248, 259 (S.D.N.Y. 2008) (Marrero, J.).

Defendants' suggestion that any claim regarding the Company Stock Fund was barred six years after they included the Fund in the Plans is contrary to <u>Consultants</u>, 966 F.2d at 1087-88. Moreover, this suggestion ignores the continuing breach, ignores the subsequent decision to dump company stock from the Pension Plan and to no longer use it to compensate executives, and ignores using a contrived benchmark to make the company stock performance look good. Further, it ignores the blatantly false characterization of these funds as "great." See above at 30. Defendants committed additional deceptive acts regarding the Company Stock Fund in an attempt to hide their knowledge of the undue concentration of imprudent company stock in the Plans coerced by Defendants, they consciously prepared contrived communications about the need and means to diversify the retirement accounts. In reviewing drafts of a participant communication in 1998, Mr. Hunkeler noted "examples 2 and 3 may be too risqué [sic] because they touch on the need of investors to diversify their investments (a need our plans don't fully satisfy)". Exh. 29 at 1. Defendants had to cut out the following disclosures:

> diversification involves spreading your money across many investments in order to avoid large losses in any one investment alone.

> a portfolio of stocks, bonds, and cash equivalents can be expected to provide better return per unit of risk than a portfolio invested exclusively in any one asset.

Exh. 29 at 4-5; cf. App. 1681. Defendants recognized the Company Stock Fund restrictions made it "*virtually impossible*" to discuss with participants the need for diversification. Exh. 19 at 6-7 (93:23 - 94:16), 13.

This concealment went on for years. In preparing a 2003 communication, Defendants specifically cut the following text:

> Because if you don't diversify and, instead, put all your money in to just one investment that does poorly, you do poorly overall.

> If you invest in the International Paper Company Stock Fund, remember that the Fund is not diversified because it invests in one company, International Paper. In

> general, a non-diversified investment in only one company is more risky than a
> diversified investment in many companies.

Exh. 30 at 2; cf. exh. 31. Defendants thus engaged in an ongoing effort to conceal the effect on

diversification and safety of participant retirement savings caused by Defendants' breach of

fiduciary duties in operating the Company Stock Fund.

Defendants actively concealed the imprudence of IP stock in *any* investment portfolio by

providing participants with a known false benchmark by which to measure the Stock Fund's

performance in order to make the Fund appear to be performing well. See above at 21.

Defendants' reference to one sentence in their February 1997 "Understand Your Savings Plan

Investments" document does not mitigate the fact that the misleading benchmark was provided

in *all* performance summaries of the Company Stock Fund. Cf. MIS at 30 n.73.[50] If Defendants

intended that to be a disclosure regarding the performance of IP stock, they would have included

that statement on the Fund Performance page of their Year In Review, not in an entirely different

document, and they would have stated it more than once. While they provided an inappropriately

narrow S&P Paper products sector benchmark to participants, Defendants internally used a

different one - the S&P 500 benchmark - when monitoring IP stock performance before dumping

it from the Pension Plan. Exh. 21 at 2; see above at 21.[51] Defendants further falsely told

participants that they could expect strong returns by rating the return potential of the Fund as

"High", when they had determined that the return potential was, in fact, not only not high, but

---

[50] Defendants disingenuously say this is only an "example", but cite no similar disclosure in any of 13 such publications from 1997-2000 they included in their appendix. No similar statement appeared the following year. App. 1680. Again, this certainly demonstrates, at a minimum, substantial issues of fact which preclude summary judgment.

[51] The abysmal performance of IP stock shown by these comparisons to the S&P 500 (nearly 13% over the 5-year period in the cited performance review) undoubtedly influenced Defendants' decision to dump IP stock out of the Pension Plan. This comparison was concealed from participants, by the use of a benchmark intended to make the performance look good.

unfit for their corporate Pension Plan or as a way of compensating their executives.

Because of these deliberate acts of active concealment, Defendants' breaches in failing to remove or minimize IP stock as a Plan investment or at least removing the restrictions on participant divestment from IP stock when Defendants had determined the stock was imprudent could not have been discovered before September 2000. Consultants, 966 F.2d at 1095-96 and n.19, 1098 n.22. Any one of the acts of concealment by itself tolls the statute of limitations; taken together, they provide overwhelming facts demonstrating that Defendants have not met their burden of proving this affirmative defense. The Company Stock Fund claim therefore is not barred. Alternatively, it simply cannot be seriously suggested that there are no genuine issues of material fact regarding it.

B.     Neglect of the 401(k) Plans.

Only by mischaracterizing Plaintiffs' argument as Defendants' failure to include certain investments in the Plans can Defendants argue that Plaintiffs' claims about the imprudence of investment options in the Plans are barred. MIS at 31-32; cf. Part III above at 12-14. Moreover, Defendants misstate the law. Defendants had ongoing duties of prudence and loyalty in both selecting and maintaining investment options in the Plans. Consultants, 966 F.2d at 1087-88. Claims for breach of those duties are not barred six years after the initial investment decision is made; otherwise, the ongoing duty would terminate, as the Seventh Circuit pointed out in Consultants. Again, Defendants have not met the burden of proving this affirmative defense.

C.     Excessive Administrative Fees - Towers Perrin.

Defendants similarly mischaracterize the claim involving excessive recordkeeping fees paid to Towers Perrin. MIS at 32-33. It is not the execution of the contract that is the breach, it is the paying of the excessive fees that is the breach. 29 U.S.C. §1104(a)(1)(A) (plan assets may be

used to defray only reasonable expenses of administration). Defendants do not dispute they paid Towers Perrin excessive fees after September 2000. The six-year limitation does not bar the claims as to those fees. As set out further below, the claims for damages for the period from 1997 to September 2000 are also not barred, because Defendants fraudulently concealed their breach of fiduciary duties.

Mr. Hunkeler admitted that he knew that Towers Perrin's fees were excessive in 1997 and informed IP of that fact, providing detailed support for his conclusion. Exh. 10 at 20. By Hunkeler's assessment, these excessive fees resulted in a "$2.6 million leak" every year, at a time when they totaled $112 per participant, a level far exceeded in following years, reaching as high as $188 in 1999. Id. at 12-13 (161:21 – 162:20), 28. Hunkeler concluded that the fiduciaries should be able to obtain administrative services for the Plans for under 10 basis points, less than half of the 23 basis points IP was paying. Id. at 20.

Although Defendants knew that the plans were overpaying for administrative services by millions per year, they concealed that information from Plan participants. Indeed, they did not even communicate to participants the fees paid to Towers Perrin. See App. 246-304, 1617-22, 1640-51. Defendants admit they did not separately disclose the Towers Perrin recordkeeping fees (what they call "overhead"), but instead lumped "overhead" in with investment management fees and only disclosed to participants the combined fee for each Plan fund, albeit only as of March 2000. MIS at 3-4;[52] App. 557-83. That concealed the amount of the fees Defendants were paying Towers Perrin.

Even these misleading, lumped-together fee disclosures were inaccurate. The March 2000

---

[52] Defendants' contention that total "overhead" of 0.17% was charged to each account in 2006 is in no way evident from the documents they cite. Cf. MIS at 4, App. 2163-64. Moreover, Defendants do not even contend they disclosed this "overhead" fee to the participants.

Savings Plan Investment Guide indicated that the Stable Value Fund charged total fees of 0.34%. App. 569. In fact, however, the fees for that Fund were 0.44%, *according to what Defendants told the Department Of Labor*. Exh. 33 at 2-3.[53] Likewise, Defendants told participants the Company Stock Fund combined fees were 0.25%, App. 582, but told the Department of Labor the fees were 0.32%. Exh. 34 at 1, 13-14. Defendants thus deliberately misrepresented to participants that fees were lower than they actually were.

Before March 2000, IP referred participants to the prospectuses of Plan investment options for fee information, e.g. exh. 43 at 10, but those prospectuses only disclosed the fees charged by the mutual fund itself, e.g. exh. 44 at 3 (showing total operating expense of 0.06%), and not the additional "overhead", particularly the additional $112 per participant fee of Towers Perrin.

The Summary Annual Report IP delivered to participants further obfuscated what fees were paid out of the Plan. The 1998 Report (delivered in 1999) provided the following information:

> Plan expenses were $196,142,672. These expenses included $196,142,672 in benefits paid to participants and beneficiaries.

Exh. 45;[54] see also exh. 46 (2000 Report). This clearly suggested there were no Plan fees. There certainly is no indication in this document that recordkeeping fees are being paid to Towers Perrin, much less the amount of such fees or that the Plan Financial Officer found those fees to be unreasonable.

---

[53] 1999 Annual Report, Form 5500. The 0.44% fee is calculated by dividing the "total administrative expenses" paid by the Fund, line (i)(5) on exh. 33 at 3, by the total assets of the Fund, line (f) on Exh. 33 at 2.

[54] Although this document informed participants of their right to obtain a "full annual report", albeit at a cost of 25 cents per page, nothing in this document or any other communications from IP provided participants any cause to seek further information on Towers Perrin fees from the full annual report.

These misrepresentations regarding the Towers Perrin component of the Plans' fees are acts of active concealment separate from the underlying wrong of Defendants' paying the excessive fees. Consultants, 966 F.2d at 1095-96 and n.19, 1098 n.22. Such active concealment is fraudulent concealment under §1113 and the six-year limitations period did not commence until the date Plaintiffs discovered Defendants' breach, regardless of the diligence they exercised. Id. That discovery did not occur, and indeed could not have occurred, until Plaintiffs' engagement of counsel and experts to derive information about these recordkeeping fees. The participants cannot have lost their rights to pursue a claim for excessive fees when IP concealed what the fees were and concealed that the Plan fiduciaries had found that they were excessive. Radiology, 919 F.2d at 1220-22.

> D.    Misleading benchmarks.

Plaintiffs' claims regarding the false and misleading benchmarks that Defendants provided participants to boost the apparent value of their investment options are not barred three years after the benchmarks were provided. Cf. MIS at 33-34; Doc. 254 at 40-41. The providing of the benchmark is not the essential fact in these claims, it is that the benchmarks were inappropriate and hence misleading. Plan participants had no actual knowledge of any information that disclosed the misleading nature of the benchmarks Defendants provided. Only from consulting with financial experts through their attorneys were Plaintiffs able to determine that the benchmarks were not only misleading, but also fraudulent in concealing the true performance of these investment options. See pages 10 (Large Cap Stock Fund), 11 (Stable Value Fund), 21 (Company Stock Fund), 29-30 (fees).

> E.    Reconstructed performance histories.

As indicated in Part VI above at 25, Defendants used manufactured benchmarks that

reported false information for funds that did not exist. This, by itself, defeats the statute of limitations claims. Further Defendants did not disclose in any manner that even a Ph.D. in Economics could decipher how they came up with their "reconstructed" past performances for the SmartMix and Core Funds introduced in the Plans in 2002. As with the misleading benchmarks, it is not only the fact that Defendants admitted the past performances were "reconstructed" – that is, made up – which is fraud and concealment, but also the fact that the "reconstructed" performances were false and misleading. That is a fact no participant could have discerned from reading Defendants' documents. This claim thus was not barred three years after the "reconstructed" performances were published. Cf. MIS at 34-35.  Again, alternatively, there are, at a minimum, many genuine issues of fact which make summary judgment unavailable.

     F.    <u>Withheld contributions.</u>

Defendants argue that since each participant knew when his or her Plan contribution was finally credited to his or her account, any claim based on that late contribution was barred three years later. MIS at 36. That might be an argument if this were a claim by an individual for delay in crediting contributions. However, it misses Plaintiffs' claim, which is that IP retained those participant contributions in its own accounts and made money from them, a prohibited transaction since it is IP earning money from Plan assets. 29 U.S.C. §1106(b)(1); 29 U.S.C. §1103(c); 29 C.F.R. §2510.3-102. That was hidden from participants and Defendants have failed to meet their burden to show they are entitled to summary judgment on this issue.

For all of these reasons, Defendants arguments for application of 29 U.S.C. §1113 are invalid and must be rejected.

     IX.    <u>CONCLUSION</u>

Defendants' arguments for summary judgment are invalid. The Court must deny Defendants' Motion.

40

March 5, 2009                                     Respectfully submitted:

                                                 /s/ Jerome J. Schlichter
                                                 Jerome J. Schlichter  02488116
                                                 jschlichter@uselaws.com
                                                 Nelson G. Wolff 6211943
                                                 nwolff@uselaws.com
                                                 Sean E. Soyars 57317 (MO)
                                                 ssoyars@uselaws.com
                                                 120 W. Main Street, Suite 208
                                                 Belleville, IL 62220

                                                 100 S. Fourth Street, Suite 900
                                                 St. Louis, MO
                                                 (314) 621-6115
                                                 (314) 621-7151 (Fax)

                                                 Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I certify that on March 5, 2009, I filed this document with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Gregory C. Braden                   Michael J. Nester
Donald L. Havermann                 Donovan, Rose, Nester & Joley, P.C.
Bridgit M. DePietto                 8 East Washington Street
Simon J. Torres                     Belleville, IL 62220
Shannon M. Callahan                 Telephone (618) 235-2020
Morgan Lewis & Bockius
1111 Pennsylvania Avenue, NW
Washington, DC 20004


/s/ Jerome J. Schlichter

41